USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1137 SUSAN ALBISTON, ET AL., Plaintiffs, Appellees, v. MAINE COMMISSIONER OF HUMAN SERVICES, ET AL., Defendants, Appellants. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ ____________________ Christopher C. Leighton, Deputy Attorney General, with whom ________________________ Michael E. Carpenter, Attorney General, and Thomas D. Warren, Deputy ____________________ _________________ Attorney General, were on brief for appellants. Mary T. Henderson with whom Patrick Ende, Linda Christ, and Pine __________________ ____________ ____________ ____ Tree Legal Assistance were on brief for appellees. _____________________ ____________________ September 27, 1993 ____________________ CYR, Circuit Judge. Plaintiffs-appellees Susan Albis- CYR, Circuit Judge. _______ _____ ton and Anita Wingert brought a class action, under 42 U.S.C. 1983, to compel timely disbursement of "pass-through" and "gap" payments under Titles IV-A and IV-D of the Social Security Act. Defendants-appellants, in their official capacities,1 challenged plaintiffs' standing. The district court rejected the challenge. We affirm. I I BACKGROUND BACKGROUND __________ Title IV-A of the Social Security Act, 42 U.S.C. 601 et seq., creates a voluntary, cooperative federal-state program __ ____ for Aid to Families With Dependent Children ("AFDC"). The AFDC program, administered by participating states, provides federal financial assistance to needy families with children who are deprived of parental support through death, disability or deser- tion. States are not required to participate in the AFDC pro- gram, but must agree to administer it in accordance with a federally approved AFDC plan if they elect to participate. King ____ v. Smith, 392 U.S. 309, 316 (1968). _____ ____________________ 1The nominal defendants are the Commissioner of the Maine Department of Human Services, 22 M.R.S.A. 3781, and the Commis- sioner of the Maine Department of Finance, 5 M.R.S.A. 282-283, 1541. Since the State of Maine is the real party in interest, however, we refer to defendants-appellants collectively as the "State," or "Maine." See Stowell v. Ives, 976 F.2d 65, 67 n.1 ___ _______ ____ (1st Cir. 1992) ("Stowell I"). _________ 2 In 1975, Congress amended Title IV-A, by requiring AFDC recipients to assign to the State their "rights to support from any other person" (including the right to child-support payments from an absent parent), as a condition to their receipt of AFDC benefits. 42 U.S.C. 602(a)(26)(A). States in turn were required to amend their Title IV-A plan, see id. at 602(a)(27), ___ ___ assuming responsibilities for enforcement of absent parents' child-support obligations [hereinafter "child-support enforce- ment," or "CSE"], under a program outlined in a new Title IV-D of the statute, 42 U.S.C. 451 et seq.2 Among other provisions, __ ____ Title IV-D requires States to "pass through" to AFDC recipients the first $50 of each monthly child-support payment the States recover from absent parents of AFDC recipients. See id. at ___ ___ 657(b); see also Wilcox v. Ives, 864 F.2d 915, 916-17 (1st Cir. ___ ____ ______ ____ 1988) (discussing origins and statutory background of States' "pass-through" obligation). Moreover, under Title IV-A, a State ____________________ which pays out less in AFDC benefits than a family's predeter- 2In order to monitor State performance under Title IV-D, mined "level of need" is required to provide supplemental monthly Congress established an Office of Child Support Supervision ["OCSE"], to which it delegated substantial authority for stan- payments, drawn from its Title IV-D child-support recovery, up to dard-setting and administrative review. See 42 U.S.C. 652(a); ___ see also Carelli v. Howser, 923 F.2d 1208, 1213-15 (6th Cir. ___ ____ _______ ______ the amount necessary to fill the "gap."3 42 U.S.C. 602(a)- 1991) (comprehensive review of OCSE duties and authority). 3In order to offset expenditures made on the AFDC recip- ient's behalf, the State may retain any child-support recoveries from the absent parent above the amount required to fund the "gap" payments to the AFDC recipient. See 42 U.S.C. 602(a)- ___ (8)(A)(vi); 657(b) (4). If a family is not receiving AFDC, or if the child-support recovery raises a family above the minimum income threshold for AFDC eligibility, the State must "pass through" the support payment in its entirety. See id. at ___ ___ 657(b), 657(c); see also 45 C.F.R. 232.20(b)(1). ___ ____ 3 (28); see also Stowell v. Secretary of HHS, ___ F.2d ___, ___ ___ ____ _______ _________________ (1st Cir. 1993) ("Stowell II") (describing "gap-filling" under ___________ the Act); Doucette v. Ives, 947 F.2d 21, 24-25 (1st Cir. 1991) ________ ____ (discussing origins and statutory background of "gap" payment obligation); see generally Wehunt v. Ledbetter, 875 F.2d 1558, ___ _________ ______ _________ 1569-70 (11th Cir. 1989) (per curiam) (Clark, J., dissenting) (comprehensive analysis of Title IV-D legislative history). "Gap" payments are considered supplemental AFDC disbursements under Title IV-A, see Fed. Reg. 29223-25 (August ___ 15, 1988), and must be "furnished with reasonable promptness to all eligible individuals," 42 U.S.C. 602(a)(10), "without any delay attributable to the [State] agency's administrative pro- cess." See 45 C.F.R. 206.10(a)(5). The $50 "pass-through" ___ payments mandated by 657(b) are disbursed under Title IV-D, not Title IV-A, and therefore are not covered by 602(a)(10)'s "reasonable promptness" requirement. However, in 1988, respond- ing to persistent reports of "long delays [by States] in distrib- uting child support collections," see Cong. Rec. S7993 (June 16, ___ 1988) (remarks of Senator Bradley), Congress amended Title IV-D, directing OCSE to establish specific time frames for "prompt" disbursement of "pass-through" payments by the States. 42 U.S.C. 652(i). Pursuant to its statutory authority, OCSE adopted regulations requiring "pass-through" payment disbursements to eligible AFDC recipients, under 42 U.S.C. 657, within fifteen _______ days of the State's receipt of child-support payments from an ____ 4 absent parent or collecting agency. See 45 C.F.R. 302.32(f)- ___ (2).4 II II PROCEDURAL HISTORY PROCEDURAL HISTORY __________________ Maine participates in the AFDC program as a "gap" state, i.e., one whose AFDC benefits do not fully meet the AFDC ____ recipient's designated "level of need."5 Accordingly, Maine must make "gap" payments, as well as "pass-through" payments, to eligible AFDC recipients. Plaintiffs Albiston and Wingert are eligible AFDC recipients who assigned their child-support rights to Maine under 602(a)(26)(A), but experienced significant delays (two and six months, respectively) in receiving "gap" and "pass-through" payments. Alleging "systemic" administrative deficiencies, plaintiffs brought the present class action for ____________________ 4The Secretary subsequently amended the 15-day requirement to provide that the "pass-through" payment may be made within fifteen days after the month in which payment was due from the _____ __ _____ _______ ___ ___ absent parent. See 57 Fed. Reg. 54519 (Nov. 19, 1992). Unless ___ otherwise indicated, however, we refer to the version in effect at the time the present action was initiated. 5When this action was brought, the gap between AFDC benefits and "level of need" for a family of three (one adult and two children) was $ 199. Maine subsequently reduced its "level of need," narrowing the "gap" obligation somewhat. Maine's AFDC "gap," and its later reduction in the "level of need," are discussed in Stowell I, 976 F.2d at 67, and in Stowell II, ___ _________ __________ F.2d at ___ [slip op. at 3-4 & n.1]. 5 declaratory and injunctive relief under 42 U.S.C. 1983.6 Although Maine disputes the severity of its "systemic" problems, it acknowledges that "gap payment" disbursements are delayed in individual cases by a variety of administrative factors, including inadequate staffing, computer programming errors, clerical mistakes, and errors caused either by collection agencies or other states. Maine also acknowledges that, as of the initiation of this lawsuit, it missed OCSE's 15-day deadline for processing "pass-through" payments in approximately 66% of its qualifying AFDC cases. But it argues that Titles IV-A and IV-D, which require "substantial compliance" on penalty of cutbacks in federal funding, see 42 U.S.C. 604(a)(2), 603(h), ___ impose no corresponding, judicially cognizable obligation to make timely "gap" and "pass-through" payments in individual cases, and __ __________ _____ that plaintiffs therefore lack standing to enforce a timely- ____________________ 6The district court certified Albiston and Wingert as repre- sentative of a plaintiff class consisting of all present, former and future AFDC recipients with a present entitlement to pass-through and gap payments within the State of Maine: (a) who have not received or will not receive their $ 50.00 pass-through payment under 42 U.S.C. 657(b)- (1) within 15 days of the date the child support from which the $ 50.00 payment is derived was received by the State of Maine; and (b) who have not received or will not receive their "GAP" payment pursuant to 42 U.S.C. 602(a)(28) by the month after the month in which the child support pay- ment from which the GAP payment is derived was received by the State of Maine. 6 payment obligation in a private action under 1983.7 III III DISCUSSION DISCUSSION __________ The 1983 remedy presumptively encompasses violations of federal statutory rights by state officials. See Maine v. ___ _____ Thiboutot, 448 U.S. 1, 4 (1980) (finding private cause of action _________ under 1983 to enforce rights conferred by Social Security Act). Nevertheless, certain post-Thiboutot cases, see, e.g., Suter v. _________ ___ ____ _____ Artist M., 112 S.Ct. 1360 (1992); Pennhurst State Sch. & Hosp. v. _________ ____________________________ Halderman, 451 U.S. 1 (1981), have been "difficult for lower _________ courts to reconcile" with the presumptive availability of a private right of action for statutory enforcement. See Evelyn V. ___ _________ v. Kings County Hosp. Center, 819 F. Supp. 183, 190 (E.D.N.Y. __________________________ 1993) (surveying 1983 caselaw from Thiboutot to Suter). _________ _____ In Golden State Transit Corp. v. Los Angeles, 493 U.S. __________________________ ___________ 103, 106 (1989), and Wilder v. Virginia Hosp. Ass'n, 496 U.S. ______ _____________________ 498, 508-09 (1990), the Supreme Court synthesized prior case law, reaffirming the presumptive availability of a 1983 remedy for violations of federal statutory rights, but articulating several ____________________ 7The Secretary is charged with conducting periodic audits of State performance under Title IV-D and has promulgated regula- tions deeming a State in "substantial compliance" with Title IV-D provided the applicable statutory requirements are met in 75% of the cases reviewed in the particular State. See 45 C.F.R. ___ 305.20. 7 broad exclusions.8 First, because "section 1983 speaks in terms of 'rights, privileges, or immunities, [rather than] violations ______ of federal law," Golden State, 493 U.S. at 106 (1989) (emphasis _____________ added), private relief is considered unavailable if the federal statute at issue does not "create enforceable rights." Wilder, ______ 496 U.S. at 519 (citing Wright, 479 U.S. at 423). Whether a ______ statute creates "enforceable rights" turns on [A] whether 'the provision in question was intend[ed] to benefit the putative plaintiff.' If so, the provision creates an enforceable right unless it [B] reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless [C] the interest the plaintiff asserts is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.'" Id. at 509 (citations omitted). Second, 1983 may be unavail- __ able if "Congress foreclosed [private] enforcement in the enact- ment" whose enforcement is sought, by providing an alternative, comprehensive administrative scheme for redressing individual ____________________ 8The Court in Wilder found a private right to enforce a ______ Boren Amendment requirement that Medicaid expenses be reimbursed at rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 496 U.S. at 507. The Court in Golden State upheld ____________ a private right, under 1983, to enforce National Labor Rela- tions Act provisions against state interference in collective bargaining procedure. 493 U.S. at 112-13. Both cases cited approvingly to Wright v. City of Roanoke Redevelopment & Hous. ______ _______________________________________ Auth., 479 U.S. 418, 423 (1987), which upheld a private right to _____ enforce the Brooke Amendment's statutory directive that public housing rents incorporate "reasonable" utility rates. 8 plaintiffs' grievances under the statute. Smith v. Robinson, 468 _____ ________ U.S. 1, 10-20 (1981); Middlesex County Sewerage Auth. v. National _______________________________ ________ Sea Clammers Ass'n, 453 U.S. 1, 20 (1981). __________________ The framework established in Golden State and Wilder ____________ ______ continued to be used for several years in determining whether 1983 permitted a private right of action for the enforcement of federal "spending" statutes. See, e.g., Playboy Enterprises v. ___ ____ ___________________ Public Svce. Com'n, 906 F.2d 25, 32-33 (1st Cir.), cert. denied, ___________________ _____ ______ 111 S.Ct. 388 (1990) (applying Wilder analysis; upholding private ______ enforcement of "editorial control" provisions in Cable Communica- tions Policy Act). Then, the Supreme Court appeared to depart from this framework in Suter v. Artist M., 112 S.Ct. 1360, where _____ _________ it considered whether an enforceable private right of action arose under the "reasonable efforts" provision of the Adoption Assistance and Child Welfare Act ["AACWA"]. The Suter Court _____ acknowledged that the AACWA was "mandatory in its terms," in that it required States to "have a plan approved by the Secretary which . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." Id. at 1367 (quoting 42 U.S.C. 671(a)(15)). Suter ___ _____ noted, however, that the States were given "a great deal of discretion" in defining the terms of their compliance with the AACWA, since the statute, its legislative history, and the 9 accompanying regulations provided no "further . . . guidance . . . as to how 'reasonable efforts' [were] to be measured." Id. ___ at 1368-69. Accordingly, Suter held, Congress intended "to _____ impose only a rather generalized duty on the State." Id. at ___ 1370. And, this "generalized duty" was too vague to permit an inference that Congress had intended to "confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." Id. at 1367. Suter's failure explicitly to apply ___ _____ the framework outlined earlier in Wilder led two dissenting ______ Justices to assert that the holdings of the two cases were "plainly inconsistent," and that the Suter majority had "changed _____ the rules of the game without even minimal justification," in effect overruling Wilder, sub silentio. 112 S.Ct. at 1371, 1377 ______ ___ ________ (Blackmun, J., dissenting). In Stowell I, 976 F.2d at 68-70, this court examined _________ the Suter dissenters' claim that Suter had overruled Wilder. _____ _____ ______ Stowell I concluded, however, that though Suter "shed new light _________ _____ on this fuliginous area of the law," it was "much too early to post epitaphs for Wilder and its kin," and that it was "both ______ prudent and possible to synthesize the teachings of Suter with _____ 10 the Court's prior precedents." 976 F.2d at 68.9 Revisiting the issue today, we conclude that Suter left the basic Wilder frame- _____ ______ work intact, but added a further threshold inquiry, applicable in cases involving "federal-state funding statutes" enacted pursuant to the "Spending Clause." See Pennhurst, 451 U.S. at 17-18 ___ _________ (noting special attributes of statutes enacted under Spending Clause, which assume "the nature of a contract" between state and federal governments); see also Suter, 112 S.Ct. at 1366 & n.7 ___ ____ _____ (quoting Pennhurst, and noting AACWA's enactment pursuant to _________ Spending Clause). When federal-state funding statutes enacted pursuant to the Spending Clause "fail[] to impose a direct ______ obligation on the States, instead placing the onus of compliance __________ __ ___ ______ ____________________ 9 For one thing, Suter offered no analytic _____ framework to replace the structure erected in the Court's previous decisions. For another thing, the Suter Court, while weakening ear- _____ lier precedents in certain important re- spects, was careful not to overrule them. Indeed, the majority relied on those prece- dents as pertinent authority. Stowell I, 976 F.2d at 68. Other courts of appeals also have _________ found Suter reconcilable with "Wilder and its kin." See, e.g., _____ ______ ___ ____ Procopio v. Johnson, 994 F.2d 325, 331 n.9 (7th Cir. 1993); ________ _______ Clifton v. Schaefer, 969 F.2d 278, 283-85 (7th Cir. 1993); Dorsey _______ ________ ______ v. Housing Auth. of Baltimore, 984 F.2d 622, 631 (4th Cir. 1993). __________________________ Some further confirmation of this position may have been offered last Term, when Justice White, a member of the Suter majority, _____ cited Suter alongside Wilder and Wright in a dissenting opinion _____ ______ ______ a juxtaposition which went unremarked by the majority. See ___ New York v. United States, 112 S. Ct. 2408, 2445 (1992) (White, _________ _____________ J., dissenting) ("we have upheld 1983 suits to enforce certain rights created by statutes pursuant to the Spending Clause [citing Wilder and Wright], though Congress must be cautious in ______ ______ spelling out the federal rights clearly and distinctly [citing Suter]"). _____ 11 with the statute's substantive provisions on the federal govern- ment, no cause of action cognizable under section 1983 can flourish." Stowell I, 976 F.2d at 70 (emphasis added). _________ Viewed in this light, Suter's impact on our 1983 _____ jurisprudence is neither particularly "far-reaching" nor "plainly inconsistent" with prior precedent. Since Suter, 1983 cog- _____ nizability in the ambiguous context of shared state-federal obligations contemplates that the alleged breach of statutory rights shall have resulted from some impermissible "state ac- _____ tion," rather than from a mere default in the performance of a federally-retained obligation. This said, however, two other aspects of Suter's holding require our consideration. _____ First, although a congressional intent to create ______ "enforceable rights" may be presumed simply from the enactment of a federal statute mandating performance of specific duties, see ___ Golden State, 493 U.S. at 112-13, a congressional intent to _____________ impose those obligations on participating States may not be ______ _____ ___________ __ _____________ ______ presumed, but must be demonstrated by the 1983 plaintiff. Suter, 112 S.Ct. at 1367-68. Second, and equally important, in _____ order to "impose a direct obligation on the States," the plain- tiff must show that Congress has delineated the obligation "unambiguously," i.e., with sufficient specificity to permit ____ States to "exercise their choice [to participate in the statutory scheme] knowingly, cognizant of the consequences of their partic- ipation." See Pennhurst, 451 U.S. at 17. A federally-imposed ___ _________ 12 statutory obligation is not enforceable in a private action against the State under 1983 if its terms are so vague and generalized that their "meaning will . . . vary with the circum- stances of each case" so as to be insusceptible to judicial enforcement. See Suter, 112 S.Ct. at 1368-70; see also Penn- ___ _____ ___ ____ _____ hurst, 451 U.S. at 17 ("The legitimacy of Congress' power to _____ legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'con- tract.' There can . . . be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it") (citations omitted). 13 A. A Statute Enacted Under the Spending Power Must A. A Statute Enacted Under the Spending Power Must Delegate a Mandatory Duty Directly to the States Delegate a Mandatory Duty Directly to the States ________________________________________________ We agree with plaintiffs that the challenged statute and its implementing regulations satisfy Suter's threshold _____ mandate by imposing reasonably clear, judicially enforceable obligations directly on the participating States. We begin with the statutory provisions covering gap payments. Under Title IV-A, in order to receive federal subsidies under the AFDC program, a State is obligated to adopt a plan, see King v. Smith, ___ ____ _____ 392 U.S. at 333, which ". . . provide[s] that aid to families with dependent children shall be furnished with reasonable _____ promptness." See 42 U.S.C. 602(a) (10)(A) (emphasis added). ___ Moreover, the State's obligation does not cease once it obtains initial administrative approval of its plan; even after the _____ Secretary has given administrative approval, the State must also ____ ____ "comply substantially with [all] provisions required by section 602(a) . . . to be included in the plan," id. at 604(a)(2). If ___ a State is not in compliance with the terms of its plan, the Secretary "shall make no further payments to such State (or shall _____ limit payments to categories under or parts of the State plan not affected by such failures)." 42 U.S.C. 604(a) (emphasis added). Like the "reasonable efforts" requirement in Suter, _____ these requirements are "mandatory in [their] terms," 112 S.Ct. at 1367. Indeed, then-Justice Rehnquist's Pennhurst opinion quoted _________ the statutory predecessor to 602(a)(10), including its "reason- 14 able promptness" language, as an example of an "instance[] where Congress . . . intended the States to fund certain entitlements as a condition of receiving federal funds, . . . [and] proved capable of saying so explicitly." 451 U.S. at 17-18. See also, ___ ____ e.g., Carleson v. Remillard, 406 U.S. 598, 600 (1972) (stating ____ ________ _________ that 602(a)(10) "places on each State participating in the AFDC __ ____ _____ program the requirement that 'aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals") (emphasis added); King v. Smith, 392 U.S. ____ _____ at 333 (asserting that State of Alabama "breached its federally ________ ___ _________ imposed obligation [under statutory predecessor to 602(a)(10)] _______ __________ to furnish 'aid . . . with reasonable promptness to all eligible individuals'") (emphasis added). Seemingly no less clear is the delegation to the States of the Title IV-D mandated obligation to disburse "pass-through" payments in a timely fashion. Section 654(13) provides that a State child-support plan must provide, in pertinent part, "that the State will comply with such other requirements and standards as the Secretary determines to be necessary." Section 657(b) of Title IV-D governs the terms under which "amounts collected as support by a State . . . shall . . . be distributed" by the _____ collecting State. (Emphasis added.) The 1988 amendments to Title IV-D require OCSE, as part of its "standards for State programs," 42 U.S.C. 652(a)(1), to promulgate mandatory regula- tions which "shall include standards establishing time limits _____ 15 governing the period or periods within which a State must dis- ____ tribute, in accordance with section 657 of this section, amounts collected as child-support pursuant to the State's plan." Id. at ___ 652(i) (emphasis added). The OCSE regulations in effect at the commencement of this litigation provided that Amounts collected by the IV-D agency on be- half of recipients of aid under the State's title IV-A . . . plan . . . shall be distrib- _____ uted as follows: (i) . . . When the IV-A agency sends payments to the family under 302.51(b)(1) of this part, the IV-D agency must forward any amount ____ due the family under 302.51(b)(1) to the IV-A agency within 15 calendar days of the date of initial receipt in the State of the first $ 50 of support collected in a month, or, if less than $ 50 is collected in a month, within 15 calendar days of the end of the month in which the support was collected. 45 C.F.R. 302.32(f)(2) (later revised; see 57 Fed. Reg. 54519 ___ (November 19, 1992)) (emphasis added). In addition, a State that fails to achieve "substantial compliance" with the Title IV-D requirements, including its 657 distribution obligations and OCSE's 15-day "promptness" provision, shall have "amounts other- _____ wise payable . . . reduced." 42 U.S.C. 603(h)(1) (emphasis added). We conclude that these provisions impose a specific, definite and mandatory obligation directly on participating States. See generally Howe v. Ellenbecker, 774 F. Supp. 1224, ___ _________ ____ ___________ 1230 (D.S.D. 1991) (considering Title IV-D in light of Pennhurst; _________ "The language in Title IV-D is mandatory and set[s] out in specific and definite terms . . . . what states must do to 16 participate in the program"); Behunin v. Jefferson Cty. Dept. of _______ _______________________ Social Servs., 744 F. Supp. 255, 258 (D. Colo. 1990) ("The ______________ mandatory language of Title IV-D, and its clear intent to benefit children and their families[,] distinguish this statute from the statute considered in Pennhurst"); Carelli v. Howser, 733 F.- _________ _______ ______ Supp. 271, 276 (S.D. Ohio 1990) (citing 654(13); "the language of Title IV-D is clearly mandatory rather than precatory," and creates "specific and definite benefits"), rev'd on other _____ __ _____ grounds, 923 F.2d 1208 (6th Cir. 1991). _______ It is the imposition of mandatory obligations directly on the States, as distinguished from the Secretary, that sepa- rates the "promptness" obligations under Titles IV-A and IV-D from the statutory provisions considered in Suter and Stowell I. _____ __________ In Suter, the Court concluded that the AACWA requirement of _____ "reasonable efforts" was "mandatory," and "does place a require- ment on the States," but held that because of its vagueness "that requirement only goes so far as to ensure that the State have a ____ ____ __ ___ __ __ ______ ____ ___ _____ ____ _ plan approved by the Secretary which contains the 16 listed ____ ________ features." 112 S.Ct. at 1367 (emphasis added). Likewise, in Stowell I, 976 F.2d at 69, plaintiffs sought 1983 enforcement _________ of a statutory provision which simply and forthrightly provides, in haec ____ verba, that 'the Secretary shall not approve _____ any State plan for medical assistance' if the State has reduced AFDC payment levels below the level prevailing on May 1, 1988. 42 U.S.C. 1396a(c)(1). By its express terms, section 1396a(c)(1) obliges the federal gov- 17 ernment, in the person of the Secretary of Health and Human Services not the State to take action. The statute could scarcely be clearer. In the present case, on the other hand, although the Secretary retains oversight responsibility for monitoring "sub- stantial compliance" with the State's plan, plaintiffs do not base their statutory claim on the Secretary's nonperformance of these oversight obligations, but on the State's separate "com- ________ pliance" obligations as mandated. And, as discussed in Part D, infra, the Secretary's oversight responsibilities are neither _____ incompatible with, nor exclusive of, Congress' imposition upon ____ the participating State of the direct responsibility for fulfill- ___ _____________ _____ ing its plan obligations to the statute's intended beneficiaries. Rosado v. Wyman, 397 U.S. 397, 420 (1970); Lynch v. Dukakis, 719 ______ _____ _____ _______ F.2d 504, 511, 512 (1st Cir. 1983).10 B. The State's Obligation Must Be "Unambiguous" B. The State's Obligation Must Be "Unambiguous" ____________________________________________ ____________________ 10Although further discussion of this issue is reserved for Part D, infra, we pause to note one additional point. We do not _____ read Suter as disturbing the principle, articulated in Wilder and _____ ______ other cases, that a statute may impose obligations on the States despite the existence of a parallel administrative scheme for the enforcement of overall compliance with statutory provisions. See ___ Wilder, 496 U.S. at 512. Although Suter cited the AACWA's ______ _____ administrative enforcement mechanisms in passing, to "show that the absence of a remedy to private plaintiffs under 1983 does not make the reasonable efforts clause [of the AACWA] a dead letter," it made clear that its brief discussion of this subject was intended as an "aside," and not to supplant the more detailed inquiry required by Smith v. Robinson, supra, and Middlesex _____ ________ _____ _________ County Sewerage Authority, supra. See 112 S.Ct. at 1368-69 & _________________________ _____ ___ n.11. 18 Invoking Suter's requirement that delegated obligations _____ be not only "mandatory" but "unambiguous," the State raises two additional arguments concerning the alleged vagueness of the obligations imposed by Titles IV-A and IV-D. First, the State argues, the statutory requirement of "substantial" rather than "total" compliance with a Title IV-D plan, see 42 U.S.C. 602(a) ___ (27), renders the State's "promptness" obligation under the plan ambiguous in individual cases, and therefore unenforceable in a private action under 42 U.S.C. 1983. See Mason v. Bradley, 789 ___ _____ _______ F. Supp. 273 (N.D. Ill. 1992) ("full compliance with the regula- tions in every case is clearly not required"); Oliphant v. ________ Bradley, No. 91-C3055, 1992 U.S. Dist. LEXIS 8975, at *23 (N.D. _______ Ill. 1992) ("had Congress intended to mandate compliance [in individual cases] with the time frames set out in the regula- tions, it would have conditioned receipt of federal funds on total, rather than substantial, compliance") (emphasis add- _____ ed).11 ____________________ 11But see King v. Bradley, No. 92-C1564, 1993 U.S. Dist. ___ ___ ____ _______ LEXIS 11041, at *16-17 (N.D. Ill. Aug. 9, 1993), at *17 ("al- though no individual plaintiff or class of plaintiffs has an enforceable right or guarantee to be among the 75 percent of cases that must be handled in conformance with federally regulat- ed procedures . . . [,] [a]ny plaintiff or class of plaintiffs that fails to receive services in compliance with federal regula- tions when the state is running a Title IV-D program which does not substantially comply with federal procedures does have the right to sue to enjoin the State to improve its level of confor- mance until it is in substantial compliance."). In the present case, the district court's factual findings suggest that Maine had not achieved "substantial compliance" with the relevant statutory provision. Compare, e.g., Shands v. Tull, 602 F.2d _______ ____ ______ ____ 19 We think Maine misapprehends the import of the 602(a) (27) "substantial compliance" requirement in this case. By its terms, the "substantial compliance" obligation applies only to the State's compliance with the terms of the State plan itself, ____ ______ as defined in 42 U.S.C. 654. However, the 15-day compliance time frame imposed by OCSE under 45 C.F.R. 302.32(f)(2) is not directly imposed as part of the State's plan, but stems from a __ ____ __ ___ _______ ____ separate statutory provision, 42 U.S.C. 652(i), which specifi- cally relates the OCSE 15-day regulation to "the period or periods within which the State must distribute [amounts collected as child-support], in accordance with section 657 of this sec- tion." As 657 itself is mandatory, the 15-day compliance requirement imposed thereunder takes precedence over the more general "substantial compliance" directive made applicable to the State's plan by 602(a)(27). Alternatively, it may be possible, of course, to construe Maine's "substantial compliance" argument as resting on the provisions of sections 604(a)(2) and 603(h), which authorize the Secretary to withhold funds from States which do not "comply substantially" with Titles IV-A and IV-D. But if this is Maine's position, it too must fail. For one thing, with respect to the ____________________ 1156, 1160-61 (3d Cir. 1979) (barring private suit for enforce- ment of AFDC statute, where State was in "substantial compliance" with statutory provisions, but indicating that injunctive suits may be permissible where "agencies have failed to reach even substantial compliance with statutory standards"). 20 Secretary's argument under Title IV-D, 603(h)(3) provides that "for purposes of section 602(a)(27) of this title, . . . a State which is not in full compliance with the requirements of this part shall be determined to be in substantial compliance only if the Secretary determines that any noncompliance is of a technical _________ nature which does not adversely affect the performance of the ______ child-support enforcement program" (emphasis added). More generally, however, the "substantial" compliance required to avoid administrative penalties under both provisions is indepen- ____ dent of, and narrower than, the State's direct obligation to AFDC recipients. See Wilder, 496 U.S. at 514-15 & n.11 (findings and ___ ______ assurances to Secretary, prior to plan approval, are separate from subsequent obligation to comply with assurances). As the Ninth Circuit has stated, in an analogous context, "[t]he funding standard [of 'substantial compliance'] is not . . . the measure of what the regulations require; it is intended to measure how great a failure to meet those requirements should cause funds to be cut off." Withrow v. Concannon, 942 F.2d 1385, 1387 (9th Cir. _______ _________ 1991). Indeed, the AACWA, construed in Suter, also contained a _____ provision, 42 U.S.C. 671(b), requiring "substantial compliance" with the terms of the State-presented plan, or face cutbacks in aid. Although Suter cited this statutory provision for a differ- _____ ent proposition, 112 S.Ct. at 1368-69 (discussing alternative "enforcement mechanisms" under the AACWA), the Suter majority _____ 21 nowhere intimated that it thought the administrative requirement of "substantial compliance" contributed to the ultimate ambigu- ousness of the States' "reasonable efforts" obligation. Citing Suter's disapproval of the "reasonable efforts" _____ provision, Maine also argues that the Title IV-A obligation of "reasonable promptness," 42 U.S.C. 602(a)(10), is "'too vague and amorphous,'" placing it "'beyond the competence of the judiciary to enforce.'" Wright, 479 U.S. at 431-32. Again, ______ however, Maine misapprehends Suter's holding. A statute is not _____ impermissibly vague simply because it requires judicial inquiry into "reasonableness." See, e.g., Wilder, 496 U.S. at 519-20 ___ ____ ______ ("reasonable and adequate rates"); Wright, 479 U.S. at 437 ______ ("reasonable" utilities allowance); see generally, e.g., Virginia ___ _________ ____ ________ R. Co. v. System Fed'n No. 40, 300 U.S. 515 (1937) ("whether _______ ____________________ action taken or omitted is . . . reasonable [is an] everyday subjec[t] of inquiry by courts in framing and enforcing their decrees"). Rather, the relevant question is whether the action ______ or purpose whose "reasonableness" is commanded has been clearly __ _______ delineated and is susceptible of judicial ascertainment. See ___ Suter, 112 S.Ct. at 1368 (distinguishing Wilder as "set[ting] _____ ______ forth in some detail the factors to be considered in determining the methods for calculating rates") (emphasis added). Here, like ___________ _____ the "rates" considered in Wilder, or the utility allowance in ______ Wright and unlike the "efforts" prescribed, without elabora- ______ _______ tion, in the AACWA "promptness of payment" presents a straigh- 22 tforward, identifiable standard which we previously have found readily susceptible of judicial evaluation. Coalition for Basic ___________________ Human Needs v. King, 654 F.2d 838, 841 (1st Cir. 1981) (finding ___________ ____ AFDC plaintiffs "likely to succeed" on 1983 claim based on violation of "reasonable promptness" provisions in 602(a)(10)). Moreover, to the extent further guidance may be re- quired to demarcate the contours of reasonable "promptness" in the Title IV-A context, the regulations promulgated by the Secretary state that "financial assistance [under the AFDC program] . . . shall be furnished promptly to eligible individu- als without any delay attributable to the agency's administrative _______ ___ _____ ____________ __ ___ ________ ______________ process." 45 C.F.R. 206.10(a)(5)(i) (emphasis added). We are _______ not persuaded by Maine's contention that "the language of the regulation offers no . . . assistance in determining the differ- ence between necessary processing time and administrative delay." Cf. California Dept. of Human Resources Development v. Java, 402 ___ ________________________________________________ ____ U.S. 121, 133 (1971) (relying on purposes of Social Security Act to construe statutory requirement that state unemployment compen- sation programs be "reasonably calculated to insure full payment of unemployment compensation when due"). Rather, this inter- pretation plainly equates reasonable "promptness" in furnishing financial assistance with an absence of delay due to the State's _______ __ _____ ___ __ ___ _______ administrative process. We think it clear, therefore, that the ______________ _______ reference to "delay," considered in context, means "unreasonable ____________ delay," excluding whatever reasonable processing time is required 23 to credit the child-support received, determine the amount of the gap payment, and issue a check. Cf. Beasley v. Harris, 671 ___ _______ ______ F. Supp. 911, 915-16 (D. Conn. 1987) (similar argument).12 C. Section 1983 Plaintiffs Must Be Intended C. Section 1983 Plaintiffs Must Be Intended Beneficiaries of Delegated Obligations Beneficiaries of Delegated Obligations ______________________________________ As we conclude that the relevant Title IV-A and IV-D provisions satisfy the threshold test under Suter, by directly _____ delegating to the States an unambiguous statutory obligation to make reasonably "prompt" payments to AFDC recipients, we turn next to Wilder's three-part test for determining whether the ______ statutory "rights, privileges and immunities" afforded AFDC recipients under the Social Security Act are of a kind Congress meant to be enforceable under 1983. Since we have determined that the statutory responsibilities imposed upon the States by the CSE program are "unambiguous" and "mandatory" within the meaning of Suter, the second and third parts of the Wilder test, _____ ______ requiring a similar analysis, seem clearly to be met. According- ly, the Wilder "enforceable right" determination, "as reconfig- ______ ured by the neoteric principles announced in Suter," see Stowell _____ ___ _______ I, 976 F.2d at 68, turns largely on the first part of the Wilder _ ______ ____________________ 12We are not suggesting that error-free compliance is likely to be achieved in administering this program, any more than in other programs administered by agencies with limited resources. But this reality does not afford the State a safe harbor merely because its overall rate of compliance is adequate to avoid the ultimate program sanction a cutoff of federal funding. Moreover, if plaintiffs' allegations are to be credited, Maine falls below even that level of compliance. 24 test: "whether 'the provision in question was intend[ed] to benefit the putative plaintiff.'" 496 U.S. at 509. Maine concedes, for purposes of this appeal, that the plaintiff class is comprised of "intended beneficiaries" of the requirement that Title IV-D child-support be "promptly" distri- buted. Although the Eleventh Circuit has held otherwise, see ___ Wehunt v. Ledbetter, 875 F.2d 1558, 1565-66 (11th Cir. 1989) ______ _________ (Title IV-D's collection provisions primarily intended to benefit "the public fisc," not individual claimants, and therefore do not give rise to enforceable private rights), we accept Maine's concession, which conforms in any event with the conclusion reached by most courts that have considered the issue, and with our prior characterizations of Title IV-D in dictum. See, e.g., ___ ____ Carelli v. Howser, 923 F.2d 1208, 1211 (6th Cir. 1991) (rejecting _______ ______ Wehunt; finding that Title IV-D was intended both "to protect ______ ____ needy families with children [and to protect] the public fisc"); see also Doucette v. Ives, 947 F.2d at 24 (dictum) ("the CSE ___ ____ ________ ____ program [was] designed both to assist parents in collecting child ____ support . . . and to reduce state and federal government AFDC expenditures") (emphasis added); accord, Howe v. Ellenbecker, 774 ______ ____ ___________ F. Supp. 1224 (D. S.D. 1991) (same); Behunin v. Jefferson County _______ ________________ Dept. of Social Services, 744 F. Supp. 255, 257-58 (D. Colo. __________________________ 1990) (same). D. Congress Must Not Have Expressed Intent D. Congress Must Not Have Expressed Intent to Preclude Recourse to Private Remedies to Preclude Recourse to Private Remedies ________________________________________ 25 Maine's final salvo is that Congress preempted private enforcement actions under Titles IV-A and IV-D by establishing in the governing statute a comprehensive and exclusive administra- _________ tive enforcement scheme. Wilder, 496 U.S. at 520-21. The ______ Supreme Court repeatedly has stated that it "will not lightly conclude that Congress intended to preclude reliance on 1983 as a remedy for the deprivation of a federally secured right," Wright, 479 U.S. at 423. Accordingly, where a federal statute ______ erects an administrative scheme for its enforcement, the Court has required States to demonstrate, "by express provision or other specific evidence from the statute itself," id., a congres- ___ sional intent to preclude private enforcement actions. On only two occasions, however, has the Court found "express preclusion" of the 1983 remedy. In both instances the challenged statute itself expressly included remedies permitting private citizens to ________ compel State compliance with the statutory scheme. Smith v. _____ Robinson, 468 U.S. 992, 1009-13 (1984) (statute provided indivi- ________ dualized administrative hearings and judicial review for individ- ual beneficiaries); Sea Clammers, 453 U.S. 1, 20 (1981) (statute ____________ created "quite comprehensive enforcement scheme," with "many specific statutory remedies, including the two citizen-suit provisions"). In the present case, Maine does not claim that Titles IV-A and IV-D contain express provisions foreclosing private enforcement actions. Nor does it contend that the statute 26 provides a specific statutory remedy enabling aggrieved AFDC recipients to obtain redress for wrongfully-delayed payments. Instead, it argues that "express preclusion" of a private 1983 remedy is demonstrated by the statute's establishment of OCSE; the grant to OCSE of responsibility for setting and monitoring standards for "substantial compliance" with the statutory scheme; and OCSE's administrative responsibility under the statute for imposing financial sanctions on States whose programs do not "substantially comply." 42 U.S.C. 652(a). Although one court of appeals has accepted a similar argument, finding it unlikely "that Congress intended to occupy the same ground at the same time and in the same manner as the Secretary," Carelli, 923 F.2d at 1215-16, we respectfully dis- _______ agree. In our view, the OCSE administrative enforcement scheme, authorizing penalties against participating States for "substan- tial noncompliance," seems intended to protect important federal _______ interests, including prompt disbursement of federal funds to needy AFDC recipients as mandated by Congress, by ensuring that overall performance by the participating State does not fall _______ below federally-prescribed levels. The private remedy afforded by 1983, on the other hand, safeguards the individual AFDC __________ ____ recipient's interests in the timely receipt of the mandated ___________ _________ federal benefits. Though coexistent, at best these interests overlap imperfectly. For example, a State may avoid coercive administrative penalties by disbursing "pass-through" and "gap" 27 payments reasonably promptly in 76% of its AFDC cases, while violating the statutory rights of the other 24% of eligible AFDC recipients. Cf. Wehunt, 942 F.2d at 1387 ("From the standpoint ___ ______ of the applicants or recipients who are denied [statutory bene- fits] within the time mandated by federal regulations, it is no comfort to be told that there is no federal remedy because the state is in 'substantial compliance' with the federal require- ments") (footnote omitted). Accordingly, the Supreme Court repeatedly has held that administrative enforcement schemes must be presumed to parallel ________ the private 1983 enforcement remedy, rather than to "occupy the same ground" as the State contends. Rosado v. Wyman, 397 ______ _____ U.S. 397, 420 (1970) (Secretary's authority to withhold funds under 604(a) does not preclude private actions to enforce individual rights under Title IV-A; "we are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the admin- istration of its program"); Howe, 774 F. Supp. at 1230 (rejecting ____ argument that Title IV-D rights are unenforceable under Sea ___ Clammers); see also Wright, 479 U.S. at 428 (Secretary's "author- ________ ___ ____ ______ ity to audit, enforce annual contributions contracts, and cut off federal funds . . . [are] generalized powers [which] are insuffi- cient to indicate a congressional intention to foreclose 1983 remedies"); see generally Ashish Prasad, Note, Rights Without ___ _________ _______________ Remedies: Section 1983 Enforcement of Title IV-D of the Social _________________________________________________________________ 28 Security Act, 60 U. Chi. L. Rev. 197, 221 (1993) ("without a ____________ 1983 remedy, needy families with children are completely deprived of access to the federal courts to secure child support enforcement services granted them by Title IV-D"). Indeed, Wilder suggests that in certain circumstances an administrative ______ enforcement scheme may even support the finding of a private _______ right. See 496 U.S. at 514-15 ("If the Secretary is entitled to ___ reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory . . . a State is on notice . . . . [of] the concomitant obligation [to beneficiaries] to adopt reasonable and adequate rates"). Accordingly, we decline to disturb the presumption, articulated in Rosado, Wilder and ______ ______ earlier cases, that the OCSE administrative enforcement scheme parallels and does not displace the private 1983 enforcement remedy. IV IV CONCLUSION CONCLUSION __________ We hold that individual AFDC recipients possess stand- ing to bring a private action against the State, under 42 U.S.C. 1983, to enforce their right to prompt disbursement of their child-support entitlements under Titles IV-A and IV-D of the Social Security Act. The judgment of the district court is affirmed. ______________________________________________ 29