923 F.2d 1208
 59 USLW 2460
 Brenda CARELLI, Melissa Strong; Tammie Kemmeter; Diane
Fletcher; Linda Pfeffer, Plaintiffs-Appellees,
v.
Robert HOWSER, Harmon Neal, Earl Berger, William B.
Stapleton, Deborah Parker (90-3340), Roland
Hairston, and Elizabeth Lightle
(90-3341), Defendants-Appellants.
 Nos. 90-3340, 90-3341.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 16, 1990.
Decided Jan. 18, 1991.
Rehearing and Rehearing En Banc
Denied April 9, 1991.
 
 Frank J. Wassermann (argued) Legal Aid Soc. of Cincinnati, Cincinnati, Ohio, Mark Cardosi, Clermont County Legal Aid Soc., Batavia, Ohio, for plaintiffs-appellees.
 John D. Woliver, Batavia, Ohio, Alan Schwepe (argued), Office of Atty. Gen., Columbus, Ohio, for defendants-appellants.
 William H. Fraser, Office of Advocates for Basic Legal Equality, Inc., Toledo, Ohio, for Association for Children For Enforcement of Support, Inc., amicus curiae.
 Paula Roberts, Center for Law and Social Policy, Washington, D.C., for Center For Law and Social Policy and the Children's Defense Fund, amicus curiae.
 Leslie L. McCollom, Asst. Atty. Gen., Child Support Enforcement Div., Austin, Tex., for State of Tex., amicus curiae.
 Before KRUPANSKY, GUY, and SUHRHEINRICH, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendants, various county and state officials responsible for administering child support enforcement services, appeal the district court's denial of a motion to dismiss plaintiffs' 42 U.S.C. Sec. 1983 action brought to enforce the provisions of Title IV-D of the Social Security Act, 42 U.S.C. Secs. 651-669. The district court certified its decision for an interlocutory appeal pursuant to 28 U.S.C. Sec. 1292. On April 16, 1990, we granted permission to appeal.
 
 
 2
 Defendants argue that plaintiffs have failed to state a claim upon which relief can be granted because plaintiffs are not the intended beneficiaries of the statute, which is a prerequisite to their right to maintain a section 1983 action for an alleged violation. Defendants also argue that even if plaintiffs are the intended statutory beneficiaries, Congress has foreclosed private enforcement through the enactment of a comprehensive auditing scheme. Although we agree with the district court's conclusion that plaintiffs are beneficiaries of the statute, we believe the comprehensive remedial scheme provided by Congress forecloses the relief sought here, and we reverse.
 
 I.
 
 3
 Plaintiffs are all mothers who claim to be entitled to receive child support enforcement services from the defendants.[1] Plaintiffs allege that the defendants failed to comply with federal statutes and regulations which require defendants to provide efficient services to locate absent parents, establish paternity, establish support obligations through court orders, and enforce existing support orders. As a result of these failures, plaintiffs allege that they have been deprived of child support and related services to which they are entitled. Plaintiffs seek no monetary relief but request that the court "[p]ermanently enjoin Defendants and their successors from failing to provide Plaintiffs and the class they represent the effective child support enforcement services required to be provided by Defendants under applicable state and federal statutes and regulations[.]"
 
 
 4
 The district court opinion provides a cogent summary of the statutory scheme of Title IV-D:
 
 
 5
 The State of Ohio participates in the federal Aid to Families with Dependent Children (AFDC) program established by Title IV-A of the Social Security Act, 42 U.S.C. Secs. 601-617. The program is a federal-state cooperative effort administered by the states. The AFDC program provides funds to states which have implemented plans to aid needy families with children deprived of parental support due to death, disability, or desertion. 42 U.S.C. Secs. 601 & 606(a).... In order to receive AFDC funds, the state must comply with federal requirements. 42 U.S.C. Sec. 602. One such requirement is that the state must adopt a plan for child support enforcement in compliance with the standards set forth in Title IV-D and operate a child support enforcement program in substantial compliance with that plan. 42 U.S.C. Sec. 602(a)(27). The Secretary of Health and Human Services must approve the state plan in order for the state to receive federal funding. 42 U.S.C. Sec. 602(b). Once a plan complying with Title IV-D has been approved, the Secretary is responsible for conducting an audit of the state program at least once every three years to determine whether the actual operation of such program complies with the requirements of Title IV-D. 42 U.S.C. Sec. 652(a)(4). If the program is found to not substantially comply with these requirements then the Secretary must reduce the state's funding according to a formula set out in 42 U.S.C. Sec. 603(h).
 
 
 6
 Title IV-D sets forth the requirements which state plans for child support enforcement must meet.... States are required to provide child support enforcement services to families that receive AFDC benefits as well as families that do not. Families receiving AFDC are required to assign their rights to support payments to the state. 42 U.S.C. Sec. 602(a)(26)(A). Families that receive AFDC are entitled to the first $50 in support payments collected each month under a Title IV-D program. After the family has been paid the first $50, the state may retain additional support payments collected as reimbursement for AFDC payments. If the amount of support collected exceeds the amount retained as reimbursement for AFDC plus $50, then the family is entitled to that additional amount. 42 U.S.C. Sec. 657(b). Families must be notified at least annually of the amount of support payments collected by the state. 42 U.S.C. Sec. 654(5)(A). Families that do not receive AFDC are entitled to the entire amount of support collected by the state.
 
 
 7
 Carelli v. Howser, 733 F.Supp. 271, 273-74 (S.D.Ohio 1990).
 
 II.
 
 8
 It is well established that section 1983 is the vehicle for bringing a cause of action for violation of federal statutes.[2] Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). There are, however, two exceptions to this general rule. A plaintiff will not be permitted to sue under section 1983 if the federal statute does not create "rights." Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Also, a plaintiff will not be permitted to sue under section 1983 if Congress intended to foreclose such action by providing an exclusive remedy within the federal statute. Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).
 
 
 9
 In order to determine whether Title IV-D creates rights which the plaintiffs may assert pursuant to section 1983, we must first determine if "the provision in question was intend[ed] to benefit the putative plaintiff." Golden State Transit Corp. v. Los Angeles, --- U.S. ----, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (citation omitted).[3] Defendants urge that Congress enacted Title IV-D to reduce the welfare rolls. In the case of AFDC recipients, who are required to assign their support rights to the state Title IV-D agency, state enforcement pursuant to Title IV-D is a way in which some of the monies expended for AFDC may be recouped by the state. The state's enforcement actions for non-AFDC recipients enable the state to obtain child support payments in order to obviate the potential need for such individuals to collect AFDC.
 
 
 10
 In contrast, plaintiffs argue that Title IV-D was enacted for the benefit of custodial parents and their children. They argue that while AFDC recipients assign their rights to support to the state, they still receive the first $50 of whatever support is collected monthly. Moreover, in the case of non-AFDC recipients, the entire amount recovered by the state is passed through to the custodial parents and their children. Thus, plaintiffs contend, the defendants' argument that the general public is the intended beneficiary of Title IV-D is ill founded particularly in the case of non-AFDC recipients because any monies collected on their behalf go directly to them, and not the state.
 
 
 11
 Defendants rely heavily on the decision in Wehunt v. Ledbetter, 875 F.2d 1558 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990), to support their contentions. The Eleventh Circuit held:
 
 
 12
 Title IV-D seeks to recover those funds and restore the Treasury balance by enforcement of support obligations owed by the absent parents of these children. The driving force behind the program is recovery of welfare payments and a parallel commitment to remove and keep families from the necessity of welfare dependence by establishing and enforcing support obligations.
 
 
 13
 Id. at 1565. The Eleventh Circuit went on to hold that AFDC recipients were not the beneficiaries of Title IV-D. The Wehunt case did not involve non-AFDC recipients.
 
 
 14
 We disagree, at least in part, with the conclusion reached in Wehunt. The court in Wehunt, as do the parties here, seemed to foreclose the possibility that the statute could have more than one class of beneficiaries. We see no reason to conclude that the statute must be read to protect needy families with children to the exclusion of protecting the public fisc or vice versa. It seems eminently reasonable that Congress intended both purposes to be served. Indeed, needy families have as much interest in the protection of the public fisc as anyone else.
 
 
 15
 AFDC payments are a method of transferring wealth from public treasuries to the needy. Title IV-D, although continuing the process of transfer payments, was designed to try to shift at least part of the monetary burden of transfer from the public fisc to the private purses of those with support obligations. The shift in emphasis was not a zero sum game, however, as needy families stand to gain over and above any additional monies received. In 1974, the Senate Finance Committee stated that "[t]he immediate result [of Title IV-D] will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup." S.Rep. No. 1356, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 8133, 8146 (emphasis added).
 
 
 16
 In sum, it seems clear that the classes as represented by the plaintiffs here are beneficiaries in fact of Title IV-D and were intended by Congress to be such.[4] We now turn to the far more difficult question of whether Congress intended to foreclose a private right of action under these circumstances, notwithstanding that it is brought by a "beneficiary."
 
 III.
 
 17
 Our starting point in the "foreclosure" analysis is that " '[w]e do not lightly conclude that Congress intended to preclude reliance on Sec. 1983 as a remedy' for the deprivation of a federally secured right." Wright v. Roanoke Redevelopment & Housing Auth., 479 U.S. 418, 423-24, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987) (quoting Smith v. Robinson, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)). It is conceded that Title IV-D does not provide for foreclosure in express terms. Therefore, "[i]n the absence of ... an express provision, we have found private enforcement foreclosed only when the statute itself creates a remedial scheme that is 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under Sec. 1983.' " Wilder v. Virginia Hosp. Ass'n, --- U.S. ----, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455 (1990) (quoting from Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)).
 
 
 18
 The Supreme Court went on to hold in Wilder:
 
 
 19
 On only two occasions have we found a remedial scheme established by Congress sufficient to displace the remedy provided in Sec. 1983. In Sea Clammers, supra, we held that the comprehensive enforcement scheme found in the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Sec. 1251 et seq.,--which granted the Environmental Protection Agency considerable enforcement power through the use of noncompliance orders, civil suits, and criminal penalties, and which included two citizen-suit provisions--evidenced a congressional intent to foreclose reliance on Sec. 1983. See 453 U.S., at 13, [101 S.Ct., at 2622]. Similarly in Smith v. Robinson, supra 468 U.S., at 1010-1011 [104 S.Ct., at 3467-68], we held that the elaborate administrative scheme set forth in the Education of the Handicapped Act (EHA), 20 U.S.C. Sec. 1400 et seq., manifested Congress' desire to foreclose private reliance on Sec. 1983 as a remedy. The EHA contained a "carefully tailored administrative and judicial mechanism," 468 U.S., at 1009 [104 S.Ct., at 3467], that included local administrative review and culminated in a right to judicial review. Id., at 1011 [104 S.Ct., at 3468] (citing 20 U.S.C. Secs. 1412(4), 1414(a)(5), 1415).
 
 
 20
 Id. 110 S.Ct. at 2523-24.
 
 
 21
 Although the foreclosure issue would appear to be a relatively straightforward one, that appearance is deceptive. Inherent in the debate is the controversy that has continued over the proper scope of section 1983 since the Supreme Court announced its expansive definition of "under color of law" in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). It is important to remember at this point the narrowness of the question we consider. Plaintiffs have elected to rely exclusively on section 1983 as the vehicle for bringing this action. They make no claim that the statute provides an implied right of action.[5] They also limit their claim to one of statutory violation and do not, in the jurisdictional portion of their complaint, rely on the Constitution for additional support. Simply stated, plaintiffs seek to have a federal court interpret section 1983 in a manner that will enable the court to order state and local officials to do a better job of enforcing child support orders in the State of Ohio.[6] As Justice Frankfurter stated in his dissent in Monroe v. Pape:
 
 
 22
 Nor is it merely a mine-run statutory question involving a narrow compass of individual rights and duties. The issue in the present case concerns directly a basic problem of American federalism: the relation of the Nation to the States in the critically important sphere of municipal law administration.
 
 
 23
 365 U.S. at 222, 81 S.Ct. at 503.
 
 
 24
 As this litigation does not involve "civil rights" in the traditional sense and alleges only a statutory as opposed to constitutional violations, it is only since the decision in Thiboutot that there is clearly an arguable basis for using section 1983 in these circumstances. In his dissent in Thiboutot, Justice Powell opined that the decision created "a major new intrusion into state sovereignty under our federal system." 448 U.S. at 33, 100 S.Ct. at 2519. The question we must answer in this case is just how far such an intrusion should be carried. We conclude that the nature of the relief sought by plaintiffs here would cause a federal court to carry out an oversight function beyond that intended by Congress, given the comprehensiveness of the remedial scheme provided in the statute. We find it unnecessary to decide whether section 1983 can ever be used as a means of securing relief for an alleged statutory violation of Title IV-D.[7] Our holding is much narrower than that. We simply conclude, under the facts here, that plaintiffs have failed to state a claim upon which relief can be granted.
 
 
 25
 Since we do not conclude that private action is foreclosed under all circumstances by the comprehensiveness of the remedial process, we do not set forth at length the details of such process. We must, however, address it in general terms because it is significantly involved in the calculus whereby we arrive at the conclusion that plaintiffs have failed to state a claim upon which relief can be granted.
 
 
 26
 Pursuant to the requirements of 42 U.S.C. Sec. 652, the Secretary of the Department of Health and Human Services (Secretary) has established the Office of Child Support Enforcement (OCSE) as a separate unit to carry out the Secretary's responsibilities under Title IV-D. It is the function of OCSE to:
 
 
 27
 (1) establish such standards for State programs for locating absent parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the absent parent's child is living as he determines to be necessary to assure that such programs will be effective;
 
 
 28
 (2) establish minimum organizational and staffing requirements for State units engaged in carrying out such programs under plans approved under this part;
 
 
 29
 (3) review and approve State plans for such programs;
 
 
 30
 (4) evaluate the implementation of State programs established pursuant to such plan, conduct such audits of State programs established under the plan approved under this part as may be necessary to assure their conformity with the requirements of this part, and, not less often than once every three years (or not less often than annually in the case of any State to which a reduction is being applied under section 603(h)(1) of this title, or which is operating under a corrective action plan in accordance with section 603(h)(2) of this title), conduct a complete audit of the programs established under such plan in each State and determine for the purposes of the penalty provision of section 603(h) of this title whether the actual operation of such programs in each State conforms to the requirements of this part[.]
 
 
 31
 42 U.S.C. Sec. 652(a)(1)-(4).
 
 
 32
 The above statutory sections are as they exist today, but embody a number of changes made by Congress since the original language was enacted. Starting in 1984, Congress became concerned that the participating states were not operating efficient and cost effective Title IV-D programs. H.R.Rep. No. 527, 98th Cong., 2d Sess. 44, reprinted in 1984 U.S.Code Cong. & Admin. News 2447. It must be stressed at this juncture that Title IV-D was essentially a "re-capture" rather than a "benefits" program. In the typical benefits program, Congress provides funds to states to be distributed, and the primary aim of legislative and executive oversight is to see that the funds are properly accounted for and distributed to persons meeting the eligibility criteria. The role of the states, to some degree at least, is passive in that they serve as a conduit for the funds to be distributed. The responsibility of a participating state under Title IV-D is vastly different. They have to set up the machinery to administer and provide the services mandated and have the full responsibility for recapture of funds. Accordingly, Congress mandated that OCSE should develop performance evaluation standards which would allow the program audits to determine whether a participating state was actually attaining the objectives of the program. S.Rep. 387, 98th Cong., 2d Sess. 4, reprinted in 1984 U.S.Code Cong. & Admin. News 2397, 2402-03. Thus, 42 U.S.C. Sec. 602(a)(27) provides:
 
 
 33
 (a) Contents
 
 
 34
 A State plan for aid and services to needy children must....
 
 
 35
 ....
 
 
 36
 (27) provide that the State has in effect a plan approved under Part D of this subchapter and operate a child support program in substantial compliance with such a plan....
 
 Section 603(h)(1) provides:
 
 37
 (h) Reduction in amount; suspension; continuation; determination of substantial compliance by State
 
 
 38
 (1) Notwithstanding any other provision of this Act, if a State's program operated under part D is found as a result of a review conducted under section 652(a)(4) of this title not to have complied substantially with the requirements of such part for any quarter beginning after September 30, 1983, and the Secretary determines that the State's program is not complying substantially with such requirements at the time such finding is made, the amounts otherwise payable to the State under this part for such quarter and each subsequent quarter, prior to the first quarter throughout which the State program is found to be in substantial compliance with such requirements, shall be reduced....
 
 Section 603 further provides:
 
 39
 (3) For purposes of this subsection, section 602(a)(27) of this title, and section 652(a)(4) of this title, a State which is not in full compliance with the requirements of this part shall be determined to be in substantial compliance with such requirements only if the Secretary determines that any noncompliance with such requirements is of a technical nature which does not adversely affect the performance of the child support enforcement program.
 
 
 40
 42 U.S.C. Sec. 603(h)(3).
 
 
 41
 If a state is operating under a corrective plan or if a penalty has been imposed, audits are to be yearly. 42 U.S.C. Sec. 652(a)(4). On October 1, 1985, OCSE promulgated final regulations to implement the action taken by Congress in 1984. These regulations implemented the audit periods and penalty provisions. Title 45 C.F.R. Sec. 305.20(a)(1) was amended to include ten select criteria that must be fully met in order for a participating state to be found to meet the corresponding state plan requirements. Amended 45 C.F.R. Sec. 305.20(a)(2) contains nine select criteria, specifies the program requirements, and specifies that the procedures required by each criterion must be used in 75 percent of the audited cases for a participating state to meet the corresponding Title IV-D state plan requirements. 45 C.F.R. Sec. 305.20(a)(2).
 
 
 42
 The regulations provide for an elaborate system of performance indicators. For example, the regulations set forth in (a)(1) and (2) of 45 C.F.R. Sec. 305.98 address the cost effectiveness of a participating state's Title IV-D program. Section 305.98(a)(3) added a new performance indicator to evaluate the reimbursement of assistance payments made to those receiving AFDC for reasons other than unemployment. Section 305.98(b), which went into effect in 1988, sets forth four performance indicators to be used to evaluate the participating states' collection of support from the obligor of the support order. Tables are then set out in section 305.98(c)(1) that translate the ratios of the performance indicators into scores which measure the state's performance. To meet the audit criteria, a score must equal or exceed 70. 45 C.F.R. Sec. 305.98(c)(2).
 
 
 43
 The fine tuning of Title IV-D by Congress and the Secretary continues. For example, on October 13, 1988, the Family Support Act of 1988 became law. Pub.L. 100-485, 1988 U.S.Code Cong. & Admin. News (102 Stat.) 2343. This Act made numerous changes in Title IV-D. Section 101 of the Act amends 42 U.S.C. Sec. 666 to require immediate income withholding in child support orders. Section 102 of the Act amends 42 U.S.C. Secs. 602 and 657 as they apply to the deduction of the first $50 of current support collected in determining a Title IV-A recipient's eligibility.[8] Title 42 U.S.C. Sec. 667 was amended relative to the required child support guidelines to be used in determining the amount of a child support order. Participating states will be required by section 104 of the Act, 42 U.S.C. Sec. 654, to provide at least quarterly statements of child support collection. Performance standards for the establishment of paternity have been enacted by section 111 of this Act. 42 U.S.C. Sec. 652. Section 123 of the Act requires the participating state to have an authorized tracking and monitoring system. 42 U.S.C. Sec. 654. These changes are being phased in at various times between the date of enactment and 1994.
 
 
 44
 The most recent changes that became effective on October 1, 1990, are perhaps some of the most relevant to this litigation. See 54 Fed.Reg. 15876. OCSE is now required to establish time limits within which participating states must accept and respond to requests for assistance in establishing and enforcing support orders, including requests to locate absent parents, establish paternity, and initiate proceedings to establish and collect support awards. The regulations establish time frames in which participating states must perform these functions. Additionally, the regulations amend the audit regulations at 45 C.F.R. Part 305 so as to include these time frames in the audits of the participating states to determine substantial compliance for purposes of 42 U.S.C. Sec. 603(h).
 
 
 45
 Although we have only skimmed the surface of the relevant rules and regulations, we believe enough has been set forth to indicate clearly the complexity of the audit process. Indeed, an initial audit takes an average of 21 months to complete.
 
 
 46
 Pursuant to the statutory mandate, the State of Ohio has been audited. On March 2, 1987, Ohio was cited as not being in compliance in several particulars with the applicable regulations. Ohio submitted a proposal for corrective action, which was approved by OCSE. In late 1988, a follow-up audit revealed that Ohio was still not in compliance. As a result, a financial penalty was imposed upon the state as was required by 42 U.S.C. Sec. 603(h)(1). At present, a new corrective action program is underway. Any new corrective program will have to address the issue of time limits for action in response to requests from those entitled to benefits or service under the program, such as the plaintiffs in this lawsuit.
 
 
 47
 Against this backdrop, we turn now to explain in more detail why we conclude plaintiffs have failed to state a claim upon which relief can be granted. Reduced to its simplest terms, plaintiffs seek a "hurry-up" order from the federal court. Plaintiffs make no attack on the applicable regulations, and the Secretary is not even a party to this litigation.[9] They allege no acts of non-compliance beyond those already unearthed in the Secretary's audit. In fact, the plaintiffs have a motion for summary judgment pending in the district court based exclusively on the findings of the Secretary's audit. Plaintiffs do not allege that Ohio cannot or will not get its program in compliance. They concede that if the program was in compliance they would not have brought this lawsuit, notwithstanding that the Secretary requires only a 75 percent "substantial compliance" for continued eligibility.
 
 
 48
 Since the plaintiffs seek no monetary relief, there would be no particularized individual relief forthcoming if this lawsuit were to go forward. What we envision happening would be an order coming from the court directing the State of Ohio to increase staff size, do a better job of establishing priorities, and setting time limits for performing required tasks as well as responding to calls for service.[10] In short, the court's order would address all the shortcomings the Secretary has already ordered corrected.
 
 
 49
 We concede that, for the short term, a court order might be more effective. After all, the Secretary just imposes a monetary penalty on the state treasury; the court could send recalcitrant state officials to jail! We are not convinced, however, that Congress intended the federal judiciary to occupy the same ground at the same time and in the same manner as the Secretary, notwithstanding that the Secretary's corrective action might take longer. We are not suggesting that time is irrelevant. We note, however, that none of these plaintiffs is limited to waiting for the Secretary to act. This is not like a case where the government promises a monthly stipend and then does not deliver. In such a case, an intended beneficiary either gets his stipend from the government as promised or not at all. Here, each member of the class has other legal remedies for securing enforcement of court orders, establishing parenthood, or obtaining whatever relief is sought. Although Title IV-D was adopted, at least in part, to make sure that responsible parties were held to their obligations, there was no intent to supplant or preempt any private remedy available that would accomplish the same end. Congress apparently felt, perhaps erroneously, that a state could do a better job of loosening the purse strings of tardy support obligors.[11]
 
 
 50
 In many respects, what we decide today is akin to an abstention order, although we do not label it as such.[12] It does share with abstention orders the characteristic that action is not necessarily forever barred. It is delayed pending the outcome of another proceeding, a proceeding that we feel Congress intended under these circumstances to take precedence.[13]
 
 
 51
 The order of the district court denying the motion to dismiss for failure to state a claim upon which relief can be granted is REVERSED, and this matter is REMANDED to the district court for the entry of an order of dismissal pursuant to Fed.R.Civ.P. 12(b)(6).
 
 
 
 [1]
 The district court certified this as a class action for all those currently eligible and eligible in the future for child support enforcement in Clermont and Brown counties
 
 
 [2]
 42 U.S.C. Sec. 1983 provides in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 (Emphasis added). A challenge to a federal statute is maintained pursuant to the "and laws" provision of section 1983 and requires no separate constitutional challenge.
 
 
 [3]
 Plaintiffs have pointed to numerous decisions in which the use of section 1983 to enforce rights pursuant to Title IV-D has not been questioned. See, e.g., Bennett v. White, 865 F.2d 1395 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989); Mosley v. Bowen, 703 F.Supp. 1288, 1292 (S.D.Ohio 1989)
 
 
 [4]
 Illuminating on this issue are the remarks of Representative Conable during the debate on the floor of the House prior to the adoption of the 1984 amendments to Title IV-D:
 A major focus in the child-support debate during the 98th Congress has been the underlying purpose and intent behind the child-support enforcement program. Some maintained that it should aim primarily at recovering AFDC expenses incurred because families without child support must rely on welfare. Others contended that this Federal program ought to be available as a service to all families in need of assistance in securing child support, regardless of whether they receive welfare or not. This conference agreement reflects the rationale stated in both House and Senate bills which reaffirms that the program should be available to all who need services. This is an important statement of our intent that the Federal Government should assist in the costs of putting into place a nationwide efficient and effective child-support enforcement system that enables all children in need of support to receive timely and expedient assistance.
 Carelli, 733 F.Supp. at 276-77 (quoting 130 Cong.Rec. H23040 (daily ed. Aug. 8 1984)).
 
 
 [5]
 See, e.g., Artist M v. Johnson, 917 F.2d 980 (7th Cir.1990), in which the plaintiffs asserting a violation of Title IV-E of the Social Security Act rely on both section 1983 and an implied right of action granted by the statute. The court relied on the implied right of action theory as an alternate ground for finding jurisdiction
 
 
 [6]
 More than child support orders are involved here, but we use that term to reference all of plaintiffs' related claims
 
 
 [7]
 We do not mean to suggest that there are no circumstances which would justify federal judicial intervention against state and local officials relative to their responsibilities under Title IV-D. See, e.g., Mosley v. Hairston, 920 F.2d 409 (6th Cir.1990), which involved a claim of improper handling of the $50 pass-through payment provided for by Title IV-D
 
 
 [8]
 For a discussion of this amendment as it relates to the $50 pass-through payment, see Mosley v. Hairston
 
 
 [9]
 Although the Secretary could not be a defendant in a section 1983 action, we find the absence of the Secretary as a party, or at least an amicus, to be disturbing. Although not part of the record, we note that Ohio has already been penalized $7 million dollars and that the Secretary is pursuing this matter with diligence. We also note that governor-elect Voinovich has made remedial action in this area a top priority
 
 
 [10]
 This is an obvious over simplification and offered only for purposes of illustration. However, even to issue an order as limited as the one hypothesized would require lengthy and complex hearings
 
 
 [11]
 Indeed, if anyone is left temporarily without a judicial remedy, it is the class not represented by the plaintiffs in this lawsuit, i.e., the general taxpayers whose load, at least theoretically, would be lightened as a result of an effective state enforcement process
 
 
 [12]
 The defendants below requested abstention, but the district court did not address this issue
 
 
 [13]
 We note, but do not discuss, several other problems inherent in this lawsuit. First, the Secretary's remedial action is effective statewide. The suit here, on the other hand, involves only two counties. It would appear that even if judicial intervention were appropriate at this time, it needs to be statewide
 Second, the plaintiffs phrase the relief sought as injunctive, but it would seem to be more in the nature of mandamus. In general, the mandamus standard is the more stringent one and requires extraordinary circumstances for the writ to issue.
 Third, the class certified is all persons currently eligible or eligible in the future for child support services in Clermont and Brown counties. However, the majority of the class members so identified are receiving child support services. Furthermore, many of those who are not receiving child support services cannot or will not supply any information on the whereabouts of delinquent support obligors or putative fathers. All they can say is that the state should try harder to find them--a very nebulous concept on which to base relief.
 Last, the plaintiffs' complaint, unlike the Secretary's remedial program, does not appear to give any particular deference to cost effectiveness. For example, we do not read the statute to require that a state spend $100 to collect $50. Consistent with our conclusion that the public fisc is one of the beneficiaries to be served by Title IV-D, the mere fact that a given plaintiff's support payments are delinquent does not necessarily mean the state is derelict in its obligations. "Section 1983 is not ... a source of authority for federal courts to revise the structural choices any government must make." Archie v. City of Racine, 847 F.2d 1211 (7th Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989).