[No. G020375. Fourth Dist., Div. Three. Mar. 23, 1998.]

RENEE CLARK et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
COUNTY OF ORANGE, Real Party in Interest.

COUNSEL

Kayajanian & Brewsaugh and Jack J. Kayajanian for Petitioners.

Carl C. Holmes, Public Defender, Deborah A. Kwast, Chief Public Defender, Denise Gragg and Donald E. Landis, Jr., Deputy Public Defenders, and Nancy A. Space as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Laurence M. Watson, County Counsel, James L. Turner and Karyn J. Driessen, Deputy County Counsel, for Real Party in Interest.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Carol Ann White and Mary A. Roth, Deputy Attorneys General, and Ruth Sorensen as Amici Curiae on behalf of Real Party in Interest.

OPINION

SILLS, P. J.—

I

A strong bipartisan consensus has emerged as to *one* way to hold down welfare costs: Require absent parents, usually fathers, to keep up their child support obligations. (See *Wehunt* v. *Ledbetter* (11th Cir. 1989) 875 F.2d 1558, 1561 [quoting a 1988 Sen. Rep. regarding certain amendments to the Social Security Act: "The bill reported by the Committee on Finance . . . . builds upon a strong consensus, joined in by liberals and conservatives alike, that the Nation's welfare system must," among other things "enforce the principle that child support must in the first instance come from parents"]; see also Levesque, *Targeting "Deadbeat" Dads: The Problem With the Direction of Welfare Reform* (1994) 15 Hamline J. Pub. L. & Pol'y 1, 2 ["The sense of crisis and urgency has fueled a rare consensus among liberals and conservatives on what ought to be done with the growing number of children

in poverty. . . . [¶] The consensus urges a simple resolution to the welfare problem: since the largest number of children in poverty live with single mothers, return fathers to their homes, either physically or economically."].)

This consensus was reflected as early as 1974, when Congress enacted what is known as title IV-D of the Social Security Act, specifically "[f]or the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living . . . ." (42 U.S.C. former § 651.)[1]

The idea behind title IV-D, quite plainly, was to recoup welfare costs from the absent parents of children being given public assistance. (*Wehunt* v. *Ledbetter, supra,* 875 F.2d at p. 1565 ["Title IV-A provides funds from the public treasure to support children in need. Title IV-D seeks to recover those funds and restore the Treasury balance by enforcement of support obligations owed by the absent parents of these children."]; *Carelli* v. *Howser* (6th Cir. 1991) 923 F.2d 1208, 1210 ["In the case of AFDC recipients, who are required to assign their support rights to the state Title IV-D agency, state enforcement pursuant to Title IV-D is a way in which some of the monies expended for AFDC may be recouped by the state."][2]; Spector, *The Nationalization of Family Law: An Introduction to the Manual for the Coming Age* (1993) 27 Fam. L.Q. 1, 2 ["In 1975 Congress created Title IV-D of the Social Security Act [fn. omitted] in an attempt to reduce the federal welfare budget by recouping child welfare funds from the parents."]; Levesque, *Targeting "Deadbeat" Dads: The Problem With the Direction of Welfare Reform, supra,* 15 Hamline J. Pub. L. & Pol'y at p. 11 ["In efforts to stem costs, Congress turned to whoever else could be held responsible: fathers."].)

---

[1]Social Security is the topic of chapter 7 of title 42 of the United States Code. Subchapter IV of chapter 7 governs grants to states for aid and services to needy families with children and for child welfare services, and part D of subchapter IV addresses child support and establishment of paternity. (See 42 U.S.C., Pub. Health & Welf. §§ 604-1381, pp. 1, 12, 15.) Part IV-D was added as a result of Public Law No. 93-647 (Jan. 4, 1975) section 101(a), 88 Statutes 2351. 42 United States Code section 651 currently uses the word "noncustodial parents" instead of "absent parents."

[2]Recovering money spent on welfare might not have been the *only* purpose behind title IV-D, but it certainly was one of the top two. In disagreeing with the *Wehunt* decision as to whether welfare recipients could sue the state to force the states to implement the child support collection programs required under title IV-D, the Sixth Circuit in *Carelli* v. *Howser, supra,* 923 F.2d at page 1211 had this to say: "The court in *Wehunt,* as do the parties here, seemed to foreclose the possibility that the statute could have more than one class of beneficiaries. We see no reason to conclude that the statute must be read to protect needy families with children to the exclusion of protecting the public fisc or vice versa. It seems eminently reasonable that Congress intended both purposes to be served." *Carelli* in no way detracts from the idea that protecting the public fisc animates title VI-D. Obviously one of the primary reasons Congress sought to protect "needy families with children" was to reduce applications for welfare benefits in the first place.

Indeed, reducing welfare costs by offsetting collections from supporting parents is one of the "least controversial" aspects of welfare reform. (Levesque, *Looking to Unwed Dads to Fill the Public Purse: A Disturbing Wave in Welfare Reform* (1994) 32 U. Louisville J. Fam. L. 1, 2, 4.)

Title IV-D imposes a series of requirements on states, including the provision of child support collection services for all individuals. (42 U.S.C. § 654(4)(A) [". . . the State will— [¶] (A) provide services relating to . . . the establishment, modification, or enforcement of child support obligations . . . ."]; see 45 C.F.R. § 302.33 (1997) [specific regulations requiring services for individuals not receiving Aid to Families with Dependent Children (AFDC) or foster care assistance]; see also *Worth* v. *Superior Court* (1989) 207 Cal.App.3d 1150, 1154 [255 Cal.Rptr. 304].)[3]

To comply with title IV-D requirements, the California Legislature enacted a series of statutes: When separation or desertion results in welfare payments, Welfare and Institutions Code section 11350 requires local district attorneys to undertake "appropriate action" to collect from noncustodial parents amounts they otherwise were obligated to pay as child or family support by court order (or, in the absence of a court order, the amount that "would have been specified"). Welfare and Institutions Code section 11350.1, subdivision (a) allows the district attorney to prosecute such actions in the name of the county that provided the welfare on behalf of the child. And Welfare and Institutions Code section 11475.1, subdivision (a) requires each county to set up support enforcement units within local district attorney's offices to establish and enforce child support orders.

The present case arises out of a petition for a writ of mandate or prohibition brought by four indigent individuals (Renee Clark, Dean Leone, Trai Nguyen and Humberto Gonzales) who were sued by the local district attorney's family support division under sections Welfare and Institutions Code sections 11350, 11350.1 and 11475.1 in the wake of the receipt of public assistance by their children. All four sought taxpayer-funded counsel, and their requests were denied. The office of the alternate defender, which handles family law contempt matters and paternity actions, has taken up their cause in this writ proceeding even though the actions brought by the family support division do not involve either contempt or paternity. All four claim that constitutional due process requires that the government provide them counsel at public expense.

---

[3]Services must be made available to all individuals, including those who might not currently be receiving public assistance. Even here, however, the aim is still to keep welfare costs down for the sake of the taxpayers. As the court indicated in *Wehunt,* an effective support collection system will deter parents from deserting their families in the first place. (*Wehunt* v. *Ledbetter, supra,* 875 F.2d at p. 1565.)

## II

 In 1981, the United States Supreme Court had occasion in a case involving the termination of parental rights, *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [101 S.Ct. 2153, 68 L.Ed.2d 640], to explore when due process requires the taxpayers to pay for an indigent's lawyer. The bottom line is that the only *absolute* rule requiring free counsel at public expense is when there is a risk of loss of "physical liberty." The court made that point at least twice. (*Id.* at pp. 25 [101 S.Ct. at p. 2158] ["The pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation."] & 26-27 [101 S.Ct. at p. 2159] ["an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty"].)

Outside the absolute rule, three "elements" determine what "due process requires." (452 U.S. at p. 27 [101 S.Ct. at p. 2159].) They are:

—the private interests at stake;

—the risk that the procedures used will lead to erroneous decisions; and

—the government's interest. (452 U.S. at p. 27 [101 S.Ct. at p. 2159].)

Significantly, not only must these three elements be "balance[d] against each other," but their "net weight" must be sufficient to overcome "the presumption that there is a right to appointed counsel *only* where the indigent, if he is unsuccessful, may lose his personal freedom" if the taxpayers are to foot the bill for an attorney. (452 U.S. at p. 27 [101 S.Ct. at p. 2159], italics added.)

### A

 We now examine the three *Lassiter* factors. The first one is the private interest at stake. Here, it is money.

Of course, courts should be wary of the temptation to dismiss property (in general) and money (in particular) as the children of a lesser god in the grand constitutional scheme of things, i.e., to see a litigant's interest in mere money as grubby and materialistic in comparison to such elevated concerns as free speech, religion and liberty. (Cf. *In re Dependency of Grove* (1995) 127 Wn.2d 221 [897 P.2d 1252, 1261] ["Where, as here, the interest at stake

is only a financial one, the right which is threatened is not considered 'fundamental' in a constitutional sense . . . ."].)

■ It is, however, undeniable that as a matter of legal precedent for purposes of the right to make a *claim on the taxpayers* for the cost of a free lawyer, monetary interests have traditionally never been accorded the same importance as staying out of jail. The obvious point of reference is the tax law. The ordinary citizen who is forced to do battle with the IRS in a civil tax proceeding—where only money is involved—cannot call on the public treasury to pay for the services of a tax lawyer or accountant.

■ Another reference point is the drug forfeiture law, in which (unlike the typical tax case) criminality itself is necessarily implicated. Thus even though a forfeiture of property used in the illegal drug trade would appear, for sake of argument, to more closely resemble a fine levied in a criminal case than an award of damages in a civil case, there is still no right to taxpayer-paid appointed counsel. (See *People* v. *$30,000 United States Currency* (1995) 35 Cal.App.4th 936, 942-944 [41 Cal.Rptr.2d 748] and authorities cited therein; see also *U.S.* v. *7108 West Grand Ave., Chicago, Ill.* (7th Cir. 1994) 15 F.3d 632, 635.)

■ It is true that sometimes more than mere money is implicated in title IV-D child support enforcement, such as various licenses which might be granted by the state. On the other hand, the fact that the basis of any title IV-D case is by definition a child support obligation weighs in the opposite direction. As our Supreme Court has most recently pronounced, the obligation to support one's children is "among the most fundamental obligations recognized by modern society." (*Moss* v. *Superior Court* (1998) 17 Cal.4th 396, 410 [71 Cal.Rptr.2d 215, 950 P.2d 59].) It is an obligation so transcendent that there is no need for any statute to articulate it. The obligation rests on " 'fundamental natural laws and has always been recognized by the courts.' " (*Id.* at p. 410, quoting *Lewis* v. *Lewis* (1917) 174 Cal. 336, 339 [163 P. 42].) A parent who is able to support his or her children has no *legitimate* interest at all in not supporting them, and moreover has no legitimate interest in sloughing off that responsibility onto the taxpayers.

The only legitimate interest in this context is in paying the minimum lawfully appropriate amount.[4] And while the legitimate interest in paying a lawfully appropriate amount of support is certainly one which the law recognizes (e.g., *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519 [70

---

[4]The phrase "lawfully appropriate" is intended to encapsulate the whole universe of factors and considerations which bear on a lawful child support order. That universe is a matter for the substantive family law; we need not explore it here.

Cal.Rptr.2d 488]), the interest is not a particularly *exceptional* one in the due process equation. Everyone has an interest in paying as little as possible in any context. Moreover, given an abstract hobson's choice between seeing one's last bit of wealth go to either the IRS or child support, most human beings would prefer to see it go to their children. Yet if the private interest in keeping one's taxes to a lawful minimum is not sufficiently weighty in civil tax cases to establish a burden on the public fisc for free legal representation, how much less important is the private interest in keeping the support of one's children to a lawful minimum.

The private interest here obviously weighs in favor of affording counsel at public expense. But it does not weigh much.

B

The next *Lassiter* element is the risk that the procedures used will lead to erroneous decisions.

California's child support statutes are not perfect. As a matter of family law, the child support scheme set out in sections 4000 through 4253 of the Family Code has come in for a great deal of judicial criticism for its inflexibility. Justice King has noted that even the deputy district attorneys who staff the family support bureaus bringing these actions often recognize that inflexible algebraic formulas can lead to undue hardship on noncustodial parents. (See *In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1042, fn. 10 [31 Cal.Rptr.2d 749].)

The core of the child support statutes is Family Code section 4055, which sets forth an algebraic formula yielding the guideline number. Strictly speaking, the statute is impossible to actually *read*. It must be studied by plugging in numbers and seeing what happens. The first several subdivisions of the statute are really more in the nature of a glorified math problem.

Yet while the sheer complexity of the statute at first blush suggests a high risk of erroneousness, that risk is undercut by the fact that the statute *is* a math problem, and therefore susceptible to calculation by a computer. (See Fam. Code, § 4055, subd. (c) [anticipating use by court of computer program to determine support].) The key variables in the equation are relatively easy to ascertain, either by reference to income tax returns (see Fam. Code, § 4059, subd. (a)) or paycheck stubs (see Fam. Code, § 4059, subds. (b), (c) & (d)). This is not to say that attorneys working for noncustodial parents cannot provide an invaluable service for their clients in child support enforcement litigation—it would be silly to contend otherwise—but the risk

of "erroneous" results is generally not as dependent on the quality of legal representation as it is in other areas of the law. The result tends to be the inexorable result of numbers crunching rather than the art of advocacy. There are no juries to sway; the basic facts tend to be cut-and-dried. For better or worse, child support orders are pretty much the only judicial decision which is arrived at mostly by computer.[5]

While hardly dispositive of the matter, we must also note that recent legislation originating as Assembly Bill No. 1058 and codified in sections 4250 through 4253 and 10000 through 10012 of the Family Code also tends in the direction of ameliorating the risk of erroneous results in the title IV-D Case. This new legislation has created the office of the "Family Law Facilitator" to "provide education, information, and assistance to parents with child support issues." (See Fam. Code, § 4250, subd. (b); see also Fam. Code, § 10004.)

The facilitator, to be sure, functions in a nonadversarial capacity—his or her duties may include providing the court "with research and any other responsibilities which will enable the court to be responsive to the litigants' needs." (See Fam. Code, § 10005, subd. (b)(1).) Nevertheless, the facilitator is better than nothing, and can dispense information directly to litigants, which a judge could not. While we would be naive to suggest that the facilitator can take the place of a lawyer who is paid to represent a particular litigant, there is no question that the facilitator's existence pushes in that direction.

Finally, we must add that even where erroneous decisions are possible in title IV-D child support reimbursement actions, there is the safety net that no

---

[5]Probably worse. In *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 28 [210 Cal.Rptr. 762, 694 P.2d 1134], the Supreme Court quoted with approval a view that would not look altogether favorably on consigning legal results to the impersonal clockwork machinery of an algebraic formula: " 'Rigid rule following is not always consistent with a court's function to see that justice is done.' " (Quoting *Kapitanski* v. *Von's Grocery Co.* (1983) 146 Cal.App.3d 29, 32-33 [193 Cal.Rptr. 839].)

When things are done blindly by computers, there is the potential for injustice in individual cases when there is a flaw in the computer programming. (Cf. Romo & Cahill, *"Debtors Prisons" Welfare Crackdown Means No Excuses*, L.A. Daily J. (Mar. 9, 1998) pp. 1, 8 (discussing allegations of accounting errors in a district attorney's office because of faulty computer programming). This potential, of course, favors appointed counsel in the *Lassiter* balance, adding perhaps a little more weight to the risk of erroneous decision factor. But it comes nowhere near tipping the scale. It goes without saying that court hearing officers are by no means bound to make any order based on obviously incorrect data. Their duty as hearing officers is to ascertain the *truth* in welfare reimbursement cases—they do not do their jobs when they merely rubber-stamp the output from a deputy district attorney's computer. And, while in the best of all possible worlds the assistance of an attorney for the supporting parent would be greatly helpful in catching computer errors, we are mindful that the issue before us in this case is whether the *Constitution* demands the appointment of such an attorney at taxpayer expense.

contempt can come from the enforcement of any resulting judgment. "Because the judgment for reimbursement under [Welfare and Institutions Code] section 11350 is a money judgment in a civil action for debt rather than a child support order, we hold it may *not* be enforced by contempt." (*Crider* v. *Superior Court* (1993) 15 Cal.App.4th 227, 234 [18 Cal.Rptr.2d 757], italics added.)

The bottom line: There is a risk of erroneous results, as there is in all litigation. But it is a less-than-average risk in terms of how it is affected by the quality of legal representation. At most this element can weigh only moderately in favor of requiring the taxpayers to foot the bill for counsel.

## C

The final *Lassiter* element we consider is the government's interest. This factor clearly and decisively favors no taxpayer-funded counsel in title IV-D cases. The whole point, after all, of title IV-D was to *save the taxpayers' money*. An *entitlement* to free counsel for indigent defendants could easily mean that more tax dollars would be spent on title IV-D cases than the program saved in welfare costs.

One should not underestimate the pressures that appointed lawyers who found themselves working for title IV-D defendants would be under. The potential for legal malpractice would be just as present as it would be in any ordinary family law child support case. Conscientious counsel would inevitably feel the need to do a certain amount of discovery on such issues, for example, as whether the custodial spouse had been truthful in reporting his or her income or how much time the parents respectively spent with their children. (See Fam. Code, § 4055, subd. (b)(1)(B), (D) [variables affecting guideline include income of both parents and amount of time higher earner has primary physical responsibility for child].) And that work would have to be paid for. (*Cunningham* v. *Superior Court* (1986) 177 Cal.App.3d 336 [222 Cal.Rptr. 854] [trial court could not force attorney to work for free in paternity action].) On the other hand, to the degree that our fears of additional expense for discovery might not be realized because the inflexible nature of the guidelines obviates the need for discovery, there would also be a corresponding diminution in the risk of erroneous results.

Moreover, lawyers not only cost money; sometimes there is often unavoidable and justifiable delay incidental to the performance of a lawyer's duties. (Cf. *Pham* v. *Nguyen* (1997) 54 Cal.App.4th 11, 15-16 [62 Cal.Rptr.2d 422] ["For many—perhaps all—lawyers, a litigation practice entails a continual barrage of unexpected and unplanned for events. . . .

Continuances play a legitimate role in keeping a law practice manageable."].) Justifiable delay might have only an incidental effect in individual cases, but the *cumulative effect of delay* could have a catastrophic effect in title IV-D cases generally. The state could find itself with a serious compliance problem.

Federal regulations require that a certain amount of title IV-D cases be processed within a certain time. Title 45, section 303.101(b)(1) (1997) of the Code of Federal Regulations requires states to have "expedited processes . . . to establish . . . and enforce support orders." Section 303.101(b)(2)(i) of the same regulation requires that *90 percent* of title IV-D cases "needing support order establishment," must be completed in 12 months from the date of service of process. Seventy-five percent must be completed within six months.

The government interest is thus particularly strong here because elimination of expense was *itself* the motivation for the title IV-D program in the first place, and that interest is compounded by the inevitable increase in delays if publicly funded counsel become available to all Title IV-D litigants.[6] Money was at the core of Congress's imposition of the program. Lawyers at public expense is wholly self-defeating to that purpose. It would mean that a government program which began as a way to reduce the welfare rolls by forcing nonsupporting absent parents to face up to their responsibilities would become a lawyer's full-employment act.

### D

To recap the *Lassiter* balancing process. We have a relatively weak private interest which favors requiring the taxpayers to fund appointed counsel, a risk of erroneous results which weighs moderately (at most) in favor of such a requirement, and a very strong government interest in not saddling the taxpayers with the cost. The "net weight" of these elements balanced "against the presumption" of entitlement to appointed counsel only where personal freedom is involved (see *Lassiter* v. *Department of Social Services*, *supra*, 452 U.S. at p. 27 [101 S.Ct. at p. 2159]) is at most zero: one weak and one weak-to-moderate element favoring; one very strong element against. Indeed, given that the motivating factor behind the whole title IV-D enterprise was to save welfare costs, the "net weight" should be considered less than zero. In any event, there is certainly not enough weight to overcome the

---

[6]It is obvious that the people who wrote the regulations in the Department of Health and Human Services never contemplated that many title IV-D defendants would be represented by counsel, much less a situation where *every* indigent title IV-D defendant was *entitled* to counsel. Not many ordinary contested family law cases go from service to judgment in six months. (Cf. 45 C.F.R. § 303.101(b)(2)(i) (1997).)

presumption against counsel at public expense in civil cases. We must therefore reject the petitioners' claim that due process entitles them to attorneys at public expense.

## III

Quite apart from the *Lassiter* factors, petitioners rely on three California decisions in support of their claim, as if it could have some basis in the common law of this state rather than the due process clauses of the state and federal Constitutions. The three decisions are: *Salas* v. *Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226]; *County of Orange* v. *Dabbs* (1994) 29 Cal.App.4th 999 [35 Cal.Rptr.2d 79]; and *County of Ventura* v. *Tillet* (1982) 133 Cal.App.3d 105 [183 Cal.Rptr. 741]. The first two are distinguishable, the third contains dicta that is based on a simple cite checking error.

*Salas* held that the taxpayers must fund counsel for indigent defendants in *paternity* suits when the state is involved. (24 Cal.3d at p. 34.) We are not dealing with paternity suits here, and there are three reasons not to extrapolate *Salas*'s holding on paternity cases to reimbursement cases.

First, when *Salas* was decided in 1979, determinations of paternity were substantially dependent on the quality of legal representation in the case because scientific tests were not as advanced as they are today.[7] The court pointed out that, under certain circumstances, there was up to a *45 percent* probability that a test would not exclude an innocent man as the father, and therefore he would be forced to face a full-blown trial. (See *Salas* v. *Cortez*, *supra*, 24 Cal.3d at p. 30, fn. 6.) By contrast, reimbursement determinations where paternity is not an issue involve primarily cut-and-dried financial data.

Second, the nature of the state's financial interest was different in *Salas*. While the court recognized that the state did have a "financial" interest in "denying counsel to indigent paternity defendants" (see *Salas* v. *Cortez*, *supra*, 24 Cal.3d at p. 33),[8] the court pointed out that the state has "no legitimate interest" in *incorrectly* ascribing paternity. (*Ibid.*, italics added.)

---

[7]Since 1979, DNA tests have been developed which can establish paternity to an unquestionable certainty. Whether the new technology means the high court should revisit *Salas* on the question of entitlement to counsel in *paternity* cases is, however, not something with which we need concern ourselves in this case.

[8]A little deconstruction is appropriate here. We respectfully suggest that "deny" was not the right verb as the *Salas* court used it. "Deny" implies something to which one is *already* entitled to, or should have in the natural order of things. As such, its use in the context of *whether* the state and its taxpayers are obligated to pay for free counsel is tautological: One

By contrast, title IV-D enforcement is necessarily predicated on a previous determination of paternity (and maternity, where relevant), and there can be no doubt that the state has a legitimate interest, and judging by Family Code section 7570, *compelling* interest in enforcing a parent's support obligation.[9]

Finally, the factor which we find dispositive in the balancing—the fact that a requirement of tax funded counsel would be self-defeating to the very program involved—was never discussed in *Salas*.

*County of Orange* v. *Dabbs* (1994) 29 Cal.App.4th 999 [35 Cal.Rptr.2d 79] is necessarily limited to its facts, and its facts are not on point here. The *Dabbs* court never addressed whether the Constitution created an *entitlement* to indigent counsel in title IV-D cases. Rather, it focused on the narrow question of whether the appellate court should exercise its *discretion* to appoint counsel in a case of first impression concerning the retroactive application of a statute where the indigent parent had *won* at trial and the *government* was the appellant. If *Dabbs* had intended to create an *entitlement* to be borne by the taxpayers, rather than simply provide the reasons it appointed counsel in a particular case, it would have addressed the question directly. It didn't.

*Tillet* contains dicta which is directly on point, but that dicta is not persuasive because (1) like *Dabbs*, *Tillet* never really addressed the critical issue of a right to counsel at public expense in light of the *Lassiter* factors; and (2) in the language in question, the *Tillet* court mistakenly cited a prior case for a black-letter proposition which the prior case never stood for.

Because the *Tillet* dicta is on point, some explication of the case is necessary. In *Tillet*, the county sought reimbursement of welfare funds; the defendant signed a stipulation for a judgment against her. After not paying the stipulated judgment, winding up on probation for it, and then having a probation violation proceeding filed against her, the defendant—now represented by counsel—sought to set aside the original stipulated judgment. The trial court refused and the defendant appealed. (See *County of Ventura* v. *Tillet, supra,* 133 Cal.App.3d at pp. 108-109.)

After first tackling the question of appealability, the court then turned its attention to the substantive reason presented for setting aside the stipulated judgment, which involved whether she had knowingly waived her right to

---

has already insinuated one's result into the premise. "Not paying for" would have been a more neutral use of words.

[9]Family Code section 7570, subdivision (a) states that "There is a compelling state interest in establishing paternity for all children."

.

counsel before entering into the stipulation. (See 133 Cal.App.3d at pp. 111-112.) Obviously, when a defendant does not answer a complaint but merely agrees to a judgment being entered against him or her, the validity of any waiver of a right to counsel at the time the agreement is made is crucial. (See *id.* at pp. 113-114.) If the waiver is not truly knowing, then the absence of counsel contaminates the subsequent agreement. (See *id.* at p. 113.)

The *Tillet* court then sought to show that the defendant's waiver could not have been really knowing and intelligent because she was not afforded counsel at public expense. In language which would later be quoted in *Dabbs*, the court said: "An indigent defendant in a child support action prosecuted by the district attorney under Welfare and Institutions Code section 11350 is constitutionally entitled to appointment of free counsel to represent him. (*County of Los Angeles* v. *Superior Court* (1980) 102 Cal.App.3d 926, 929 [162 Cal.Rptr. 636] [162 Cal.Rptr. 636].) Two of the most significant reasons for this rule are (1) the exposure of the defendant to a deprivation of property and liberty, and (2) the enormous disparity in bargaining power between indigent defendants and the state." (*County of Ventura* v. *Tillert, supra,* 133 Cal.App.3d at p. 114.) The paragraph then ends with a quotation from *Salas* reiterating the point about the imbalance in resources between the litigant and the government. (See *Tillet, supra,* 133 Cal.App.3d at p. 114, quoting *Salas* v. *Cortez,* supra, 24 Cal.3d at p. 31.)

The case cited as support for the proposition that an indigent defendant in a child support action is *entitled* to a "free" (that is, publicly paid for) lawyer, however, said no such thing. In fact, *it said just the opposite.*

*County of Los Angeles* v. *Superior Court* (1980) 102 Cal.App.3d 926 [162 Cal.Rptr. 636] was a case involving the enforcement of a court order requiring the county to pay the attorney fees for a lawyer who had been appointed to represent a litigant in an action to recover child support. The trial court had appointed counsel on its own and directed the county to pay for it. The county balked and petitioned the appellate court for an order vacating the trial judge's order, which the court *granted*—a result wholly incompatible with the proposition for which it was cited in *Tillet.*

The *County of Los Angeles* opinion is structured so that it rejects seriatim three statutory bases for requiring the county to pay the fees of appointed counsel. (See *County of Los Angeles* v. *Superior Court, supra,* 102 Cal.App.3d at pp. 929-930.) There is nothing on page 929 of the opinion— the page cited by *Tillet* for its "entitlement" sentence—even remotely suggesting that there is a right to a free lawyer at public expense in a case where paternity is not an issue. Most of the page is taken up with rejecting two of

the three statutory justifications for finding such an entitlement. True, the top of page 929 begins by acknowledging that *Salas* requires appointment of a free lawyer in a *paternity* action, but it would be a total misreading of the opinion to extrapolate what the *County of Los Angeles* court said about *Salas* to title IV-D child support enforcement actions where paternity is not an issue. In fact, on the next page (after the court rejects the third statutory basis for such an entitlement) the court declares: "It is clear there presently exists no statutory authority, explicit or implicit, to spend public moneys to pay counsel to defend indigents in actions brought by a county under Welfare and Institutions Code section 11350 to recoup expenditures for child support." (*County of Los Angeles, supra,* 102 Cal.App.3d at p. 930.)

The *County of Los Angeles* court then went on to note that the Legislature had *yet* to authorize the use of public funds for paternity cases covered by *Salas*. The bottom line was that the counsel in *County of Los Angeles* did not get paid; he ended up working "pro bono publico." (102 Cal.App.3d at p. 931, citing *Rowe* v. *Yuba County* (1860) 17 Cal. 61.)

*Tillet* was just plain wrong in citing *County of Los Angeles* for the idea that the public must pay for free lawyers in title IV-D child support cases. In all probability, nobody focused on the significance of the words "in a paternity . . . action" in the reference to the *Salas* decision at the top of page 929. The *Tillet* dicta thus hardly represents a reasoned and principled encounter with the due process issue; it is, rather, an instance where a cite-checking error perpetuated itself.[10]

Finally, there is an issue which may be a kind of subtext to the *Dabbs* and *Tillet* decisions, and which must be addressed to complete our analysis of the *Lassiter* elements: Whether, as a matter of independent state grounds, California constitutional law, as distinct from federal constitutional law, requires a different set of factors than those promulgated in *Lassiter*. In particular, each of the cases in the trilogy relied on by petitioners here have pointed to the imbalance in litigation resources between the state and an indigent litigant as among the bases for the decision. (E.g., *Salas* v. *Cortez, supra,* 24 Cal.3d at p. 30 ["the full resources of the state"]; *County of Ventura* v. *Tillet, supra,* 133 Cal.App.3d at p. 114 ["disparity in bargaining power"]; *County of Orange* v. *Dabbs, supra,* 29 Cal.App.4th at p. 1004 [" 'level playing

---

[10]To be fair to the *Tillet* court, it should be noted that the case was decided more than a decade prior to *Crider* v. *Superior Court, supra,* 15 Cal.App.4th 227, which made it clear that a judgment for reimbursement in a title IV-D case could not be enforced by contempt. The *Tillet* court may have taken it for granted that personal freedom was directly at stake if the litigant was unsuccessful, and therefore never focused on the problem of public expense.

field' "].)[11] Has the reliance on this particular thought signaled that California common or constitutional law imposes greater burdens on the public fisc than federal constitutional law?

No. None of these cases have been so bold as to state that imbalance of resources is its own, independent factor which would justify a result under California law not otherwise called for under *Lassiter.* And clearly, imbalance cannot be a decisive factor, as it is the rare case where the state does not have greater resources than a private party in any sort of litigation. If imbalance *were* decisive then every category of case in which the state is a litigant against a private party would require the presence of taxpayer-funded counsel to ease the ambient "disparity in bargaining power." As we have seen, civil tax cases and drug forfeiture cases disprove that notion.

More to the point, the inherent imbalance between private and governmental litigants is *already* subsumed by the second *Lassiter* element—the risk of an erroneous decision. It is there that the real danger lies when a private litigant faces a governmental entity whose own counsel is paid at public expense. However, as we have seen, while the risk of an erroneous decision is a factor militating in favor of counsel at public expense here, it comes nowhere near to tipping the scale in that direction. The idea that the risk is the result of an inequality of resources between the parties adds nothing *extra* to the equation.

IV

Interestingly enough, the one case that has spoken clearly on the question of whether title IV-D litigants should receive free counsel at public expense is not *Salas, Dabbs,* or *Tillet,* but the case that *Tillet* miscited, *County of Los Angeles.* After noting that there exists "no statutory authority" to use public funds to pay counsel in Welfare and Institutions Code section 11350 cases (i.e., title IV-D collection cases), the *County of Los Angeles* court declared: "Allocation of liability for payment of attorneys' fees in such causes is the prerogative of the Legislature and not of the courts." (*County of Los Angeles* v. *Superior Court,* supra, 102 Cal.App.3d at p. 930; accord, *Cunningham* v. *Superior Court,* supra, 177 Cal.App.3d at p. 357 [suggesting Legislature appropriate funds to pay counsel in paternity cases].) To grant the requested writ would be for the judiciary to intrude upon the province of the Legislature: It is, after all, the branch of government with the traditional power of

---

[11]In the footnote in which it cited *Lassiter,* the *Dabbs* court referred to "federal due process" in a sentence mentioning "federal and state Constitutions" quoted from *Salas.* (See *County of Orange* v. *Dabbs, supra,* 29 Cal.App.4th at pp. 1002-1003, fn. 3.) Other than those whispers of insinuation, the *Dabbs* opinion never intimated that the test as to what due process requires in this area should be any different under state than federal law.

the purse. If the *Legislature* wants to use tax dollars supply free lawyers for deadbeat dads and moms—for, while some of those involved in these cases don't fit that description, that is most certainly how such an allocation will be perceived by a large group of the electorate, and, as a statistical matter, rightly so—then the *Legislature* must do so. But the state and federal Constitutions do not require it.

The writ is denied.

Rylaarsdam, J., concurred.

**SONENSHINE, J.,** Concurring.—I concur in the result but write separately because I cannot agree with most of the majority's reasoning and find much of the dicta disturbing. Indeed, although the precise question we address is one of first impression, the answer is quite simple.

These indigent litigants are not entitled to taxpayer-funded counsel because they do not face the loss of physical liberty, and no other state or federal constitutional considerations mandate such representation.

As my brethren note, our United States Supreme Court in *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 25-27 [101 S.Ct. 2153, 2158-1260, 68 L.Ed.2d 640], held one has an absolute right to appointed counsel only when facing the deprivation of physical liberty. Such is not the case here because the county may not enforce a reimbursement judgment by contempt. (*Crider* v. *Superior Court* (1993) 15 Cal.App.4th 227, 228 [18 Cal.Rptr.2d 757].)

Of course, that conclusion does not end the discussion but the result is the same. Indeed, the *Lassiter* court cautioned, "[A]s a litigant's interest in personal liberty diminishes, so does his [or her] right to appointed counsel." (*Lassiter* v. *Department of Social Services, supra,* 452 U.S. at p. 26 [101 S.Ct. at p. 2159].) It explained the presumption of no right to appointed counsel is weighed against "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." (*Id.* at p. 27 [101 S.Ct. at p. 2159].) The private interest at stake here is money which, simply stated, is not enough to even move the scale in favor of representation, let alone tip it.